[No. H035317. Sixth Dist. Mar. 1, 2011.]

In re JAVIER RODRIGUEZ on Habeas Corpus.

88

**COUNSEL**

Keith Wattley and Thomas Master, under appointments by the Court of Appeal, for Petitioner Javier Rodriguez.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Anya M. Binsacca and Amber N. Wipfler, Deputy Attorneys General, for Respondent The People.

OPINION

ELIA, J.—In this appeal, we review whether the superior court properly granted Javier Rodriguez's petition for habeas corpus relief arising out of a decision by Governor Arnold Schwarzenegger (the Governor) to reverse the 2008 decision of the Board of Parole Hearings, which had granted Rodriguez parole. For reasons that follow, we conclude that the superior court was correct in granting the petition for habeas corpus relief.

*Factual and Procedural Background*[1]

On September 17, 1984, at approximately 9:30 p.m. Rodriguez and his two brothers, Manuel and Elias, went to a convenience store in East San Jose. Elias went into the store. As he was entering the store he noticed Antonio Padilla urinating on the door. Elias told Padilla that urinating on the door was "not proper behavior." Padilla followed Elias into the store, dragged him outside and proceeded to beat him about the face and kick him in the foot. The police came to the scene, but Padilla had fled by the time they arrived.

The brothers left the convenience store in separate cars. They went to Elias's and Manuel's home. At the time Rodriguez lived in Fairfield. Rodriguez and his brother Manuel stayed outside the house and discussed how angry and embarrassed they were by what Padilla had done to Elias. Eventually, Manuel went into the house and got a rifle from his bedroom and they returned to the convenience store.

At the convenience store, Padilla was talking to three young women. When Rodriguez pulled into the parking lot, Padilla walked "rapidly toward the car" and looked in. Manuel shot Padilla four times. He died later at Alexian Brothers Hospital.

Later, Manuel told the police that he did not approach the store with the intention of shooting Padilla, but if Padilla came at him he was prepared to shoot him. During a subsequent conversation between Manuel and Rodriguez, which was overheard by police officers, Manuel stated that he did not want to kill Padilla.

On January 22, 1985, Rodriguez was convicted of first degree murder. (Pen. Code, § 187.) The court sentenced him to 25 years to life in state prison.

On November 13, 2008, the Board of Parole Hearings (the Board) found Rodriguez suitable for parole in that he would not pose an unreasonable risk

---

[1] We take the facts of the underlying crime from the probation officer's report.

of danger to society if released from prison. The Board found the following factors supported its decision to grant parole: "no juvenile criminal record of assaulting others, that to the best of [his] ability [Rodriguez had] enhanced [his] ability to function within the law upon release"; his participation in Alcoholics Anonymous; lack of a significant criminal history of violent crime; Rodriguez's "maturation, growth and greater understanding"; realistic parole plans, including family support and a job offer;[2] positive institutional behavior; the fact that he had expressed remorse for his actions; had demonstrated that he understood the nature and magnitude of his offense; had taken responsibility for his criminal behavior and demonstrated a desire to change to good citizenship; and two evaluations by state psychologists that supported his release on parole and indicated that Rodriguez's risk to public safety was low.

The Board's decision became final on March 13, 2009. (Cal. Code Regs., tit. 15, § 2041, subd. (h).) Thereafter, on April 19, 2009, the Governor reversed the Board's decision granting Rodriguez parole. The Governor based his decision on the following four reasons: "the first degree murder for which Mr. Rodriguez was convicted was especially heinous because the crime partners fired a rifle repeatedly in a public area, killing the victim and placing others at risk of death or serious injury" because the victim "was talking with other women right before the murder"; concern that Rodriguez had made "inconsistent statements," which consisted of Rodriguez telling the Board in 2008 that he put the rifle in the car because he was driving back to Fairfield, but he told the police that he took the rifle with him for protection in case he ran into Padilla; the 2008 mental health evaluation by Dr. Reynoso that found that Rodriguez lacked insight into his crime; and Rodriguez had "limited involvement in self-help and therapy over the years."

Thereafter, on May 11, 2009, Rodriguez filed a petition for writ of habeas corpus in Santa Clara County Superior Court. Rodriguez alleged that the Governor's decision violated his due process right because it was not supported by some evidence that his release on parole would pose an unreasonable risk to public safety.

On October 7, 2009, the superior court issued an order to show cause. The order outlined the four grounds that the Governor had cited to support his decision to reverse the Board as follows: the gravity of the commitment offense; Rodriguez's inconsistent statements; Rodriguez's lack of insight into the commitment offense; and Rodriguez's limited record of group or individual self-help and therapy.

---

[2] It appears that Rodriguez is subject to an immigration hold and will be deported to Mexico upon release on parole. He presented the Board with detailed parole plans to live with his father in Mexico, to work at the Cattle Association of Tihuamo, and to continue to participate in Alcoholics Anonymous.

The Attorney General filed a return on November 3, 2009, in which it was argued that the Governor's decision was supported by Rodriguez's purported lack of insight into the crime.[3] Rodriguez filed his traverse on November 20, 2009.

On February 24, 2010, the superior court granted Rodriguez's writ of habeas corpus. In a lengthy written order, the court found that the Attorney General had explicitly conceded that there was no support for the Governor's finding that Rodriguez had made inconsistent statements; had impliedly conceded two other grounds cited by the Governor by not addressing them; but had affirmatively alleged that Rodriguez's "lack of insight" supported the Governor's action.

The superior court noted, "While it is accurate that the psychologist said Petitioner's insight could improve, this appears true only in the sense that it would always be 'advantage[ous]' for insight to improve and be further articulated." The court went on to say "It is not dispositive, however, as an indicator of present dangerousness or parole unsuitability in this case when considered in light of all 'relevant reliable information.' [Citations.] The very doctor upon whom the Governor relies noted this as only one factor out of many which informed her ultimate conclusion that Petitioner was not a present danger. Parsing the psychological report, and removing a single factor out of its thoughtful consideration within the whole, is neither medically nor logically supportable." Accordingly, finding no evidentiary support for the Governor's decision, the superior court vacated the Governor's decision, reinstated the Board's grant of parole and ordered that Rodriguez be released on parole forthwith.

The Attorney General filed a timely notice of appeal.

On appeal the Attorney General argues that a gubernatorial parole reversal must be upheld if some evidence supports the Governor's finding that an inmate will pose an unreasonable risk of danger to the public and here the circumstances of Rodriguez's crime and his lack of insight into its causative factors constitute some evidence. Further, the superior court erred in ordering Rodriguez's immediate release rather than remanding the case to the Governor with instructions to proceed in accordance with due process.[4]

---

[3] The Attorney General explicitly conceded that the Governor had mistakenly attributed to Rodriguez a statement that was actually made by Manuel.

[4] On June 2, 2010, we granted the Attorney General's petition for writ of supersedeas staying enforcement of the superior court's February 24, 2010 order pending resolution of this appeal.

*Discussion*

*Standard of Review*

"When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, as happened here, the question presented on appeal is a question of law, which the appellate court reviews de novo. [Citation.] A reviewing court independently reviews the record if the trial court grants relief on a petition for writ of habeas corpus challenging a denial of parole based solely upon documentary evidence." (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192 [92 Cal.Rptr.3d 36] (*Lazor*); see also *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*); *In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 [103 Cal.Rptr.3d 549] (*Criscione*).)

*Applicable Legal Principles*

■ Pursuant to Penal Code section 3041, subdivision (a), the Board shall normally set a parole release date one year prior to an inmate's minimum eligible parole release date, unless it determines that public safety requires a lengthier period of incarceration. (Pen. Code, § 3041, subd. (b); *In re Lawrence* (2008) 44 Cal.4th 1181, 1204 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*); *In re Shaputis* (2008) 44 Cal.4th 1241, 1256 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*); *In re Shippman* (2010) 185 Cal.App.4th 446, 454 [110 Cal.Rptr.3d 326] (*Shippman*).) Release on parole is the rule, rather than the exception. (*Lawrence, supra,* at p. 1204; *In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655].)

■ However, when the Board determines an inmate convicted of murder is suitable for parole, the Governor has the constitutional authority to conduct a de novo review of the Board's decision. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2; *Lawrence, supra,* 44 Cal.4th at pp. 1203–1204; *In re Ross* (2010) 185 Cal.App.4th 636, 638 [110 Cal.Rptr.3d 811].) In conducting this review, the Governor is required to consider the same factors considered by the Board, which are specified by regulation.[5] (Cal. Const., art. V, § 8, subd. (b); *Lawrence, supra,* at p. 1204; Cal. Code Regs., tit. 15, § 2402,

---

[5] "Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

subds. (c) & (d).) However, the Governor has discretion to be " 'more stringent or cautious' " than the Board in determining whether a defendant poses an unreasonable public safety risk. (*Shaputis, supra,* 44 Cal.4th at p. 1258; see *In re Prather* (2010) 50 Cal.4th 238, 257, fn. 12 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*).)

 Our review of the Governor's decision is deferential. (*Lawrence, supra,* 44 Cal.4th at p. 1204; *Shaputis, supra,* 44 Cal.4th at p. 1254; *Rosenkrantz, supra,* 29 Cal.4th at p. 665.) "[T]he judicial branch is authorized to review the factual basis of a decision . . . denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* at p. 658.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor." (*Rosenkrantz, supra,* at p. 677.) "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports" the decision. (*Rosenkrantz, supra,* at p. 677; see *Shaputis, supra,* at pp. 1260–1261.)

 Nevertheless, the standard of judicial review of parole decisions " 'certainly is not toothless.' [Citation.] '[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights.' " (*Criscione, supra,* 180 Cal.App.4th at p. 1458.) Simply pointing to the existence of an unsuitability factor is not sufficient. "[N]ot only must there be some evidence to support the [Governor's] factual findings, there must be some connection between the findings and the conclusion that the inmate is currently dangerous." (*Ibid.*)

As noted, the Governor pointed to the following factors in his reversal to conclude that Rodriguez still poses a risk for future violence if released: the gravity of the crime; Rodriguez's inconsistent statements; his mental health

evaluations, which purportedly showed that he lacked insight into his commitment offense; and Rodriguez's limited involvement in self-help and therapy.

On appeal, the Attorney General relies on only three of those four factors: Rodriguez's lack of insight into the commitment offense and its causative factors; Rodriguez's minimal participation in self-help activities; and the nature of the commitment offense.[6]

However, as the Attorney General noted in the return to the court's order to show cause, the record does not support one of the factors upon which the Governor based his decision. Specifically, the Governor mistakenly attributed to Rodriguez a statement made by his brother Manuel. Accordingly, there is no support in the record for this factor.

■ As to the gravity of the crime, the "Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.]" (*Lawrence, supra*, 44 Cal.4th at p. 1221.) "In some cases . . . the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Id.* at p. 1191.) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.) On the other hand, "the unexceptional nature of the commitment offense will not inevitably reflect a *lack* of current dangerousness without due consideration of the inmate's postconviction actions and progress toward rehabilitation." (*Id.* at p. 1218.)

■ Here, the record does not support the Governor's assertion that Rodriguez's offense was especially heinous because "the crime partners fired

---

[6] Rodriguez asserts that the Attorney General may not now claim the Governor's decision is properly supported by factors that were voluntarily abandoned in the superior court. However, because we to review the factual basis of the Governor's decision (*Lawrence, supra*, 44 Cal.4th at p. 1205), we must look at all the factors on which the Governor relied.

a rifle repeatedly in a public area, killing the victim and placing others at risk of death or serious injury."[7] The record does indicate that the victim was talking to three women right before the murder, but nothing in the record supports the Governor's assertion that these three women were placed at risk of death or serious injury. This was pure speculation on the Governor's part. The Governor may not base his findings on hunches or intuition. (*Lawrence, supra*, 44 Cal.4th at p. 1213.)

Moreover, even if we were to give full credence to the Governor's characterization of Rodriguez's offense as "especially heinous," more is required under *Lawrence* and *Shaputis* to sustain the denial of parole based solely on the gravity of the commitment offense—namely the presence of supported factors that are probative of a nexus between that gravity and the inmate's current risk to public safety if released. This is particularly true where, as here, the inmate has already served sufficient time to satisfy a base term for the life crime.[8] (*Lawrence, supra*, 44 Cal.4th at p. 1211 [after an inmate has served a suggested base term, the circumstances of the commitment offense alone will rarely provide a valid basis for denying parole in the presence of strong evidence of rehabilitation and no other evidence of current dangerousness].)

Here, the Governor failed to articulate any rational relationship between the facts of the offense and current dangerousness. Nor can we find anything in the record that would support such a conclusion.

The Attorney General argues that the key factor relied upon by the Governor in finding that Rodriguez posed an unreasonable risk of danger to the public if released was his lack of insight into the commitment offense and its causative factors.

The record indicates that before his 2006 parole consideration hearing, Rodriguez was evaluated by the state's forensic psychologist, Dr. Macomber.

---

[7] Title 15 of the California Code of Regulations governs the Board's and Governor's parole decisions. We assume that the Governor was referring to section 2402 of title 15. Subdivision (c)(1) of section 2402 provides, "Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense."

[8] The Board found that Rodriguez's base term of confinement under its term-setting regulations was 312 months. There were no enhancements in his case, but the Board did award him 90 months of postconviction credit for a total term of 220 months, or 18 years four months. At the time of the Board's hearing in 2008, Rodriguez had already served over 23 years.

Dr. Macomber found that although Rodriguez used alcohol to excess before his incarceration and was drinking alcohol at the time of the commitment offense, Rodriguez was very aware of the destructive effects of alcohol and was determined to remain clean and sober. Based on Rodriguez's ability to refrain from drinking despite it being readily available within the prison, Dr. Macomber opined that Rodriguez had demonstrated "good self-control, maturity and determination to remain sober" and therefore alcohol use was "no longer a current diagnostic problem."

Dr. Macomber found that Rodriguez had accepted full responsibility for his role in the commitment offense and has accepted responsibility for drinking alcohol late at night, which resulted in the conflict with the victim; Rodriguez was very aware that alcohol abuse can result in "poor decision making and terrible consequences." More importantly, Dr. Macomber found that Rodriguez's "insight and self-awareness appear to be very good." Dr. Macomber concluded that "Rodriguez is a very gentle mannered, non-violent person by nature. He is not at all hostile or aggressive. Even though he lives in a negative prison environment, in which interpersonal conflicts and altercations occur on a regular basis, he has diligently avoided any conflicts or problems with others. He is very capable of resolving any disputes with others in a reasonable, rational, and responsible manner. His violence potential is very low."

If released to the community, Dr. Macomber found that Rodriguez "does not have any characteristics or qualities that would suggest that he is a threat to society in any way at this point in his life. He is determined to remain clean and sober. His determination appears to be quite sincere and genuine."

Utilizing the level of service inventory-revised risk assessment test, Dr. Macomber found that Rodriguez "poses no more threat to the community than the average citizen." Further, based upon his nonassertive personality and his growth and maturity over the years, Dr. Macomber concluded that Rodriguez "probably poses less risk to society than the average citizen in the community."

In 2008, Dr. Reynoso evaluated Rodriguez. Dr. Reynoso found that Rodriguez accepts responsibility for his role in the offense and had expressed remorse for the victim and the victim's family. Similar to Dr. Macomber, Dr. Reynoso concluded that Rodriguez does not suffer from any mental health problems. Specifically, she wrote that Rodriguez "appears psychiatrically stable with no reported symptoms or observed signs consistent with a major mental disorder."

Dr. Reynoso conducted a risk assessment of Rodriguez and found that he scored "within the *low* range of psychopathy." In addition, Dr. Reynoso found

that Rodriguez's "total score on the HCR-20 [(historical clinical risk management 20 test)] indicated a *low* risk range for future violence." Dr. Reynoso concluded that "to his credit, Mr. Rodriguez does not seem to possess negative pro-criminal attitudes" but she found that he "appears to lack some valuable insight into his involvement and level of responsibility in the life crime." Noting that Rodriguez had consistently admitted to being a passenger in the car with his brother, who he knew had a gun, Dr. Reynoso concluded that Rodriguez "lacks a clear understanding as to the causative factors behind his criminal actions, such as revenge or cultural or family loyalty issues for example, other than to state that the murder 'happened' in an instant and he was unable to react. It would be to his advantage to examine the reasons why he was willing to allow his brother [to] have a gun and return to the scene of the crime knowing the potential consequences."

Dr. Reynoso recommended "[o]ngoing education, vocational or self-study (bibliotherapy), is encouraged, but his treatment should not be considered mandatory as a prerequisite to parole consideration."

■ Neither Penal Code section 3041, nor the governing regulations list "lack of insight" as an unsuitability factor. However, in *Shaputis, supra,* 44 Cal.4th 1241, the companion case to *Lawrence* (see *Lawrence, supra,* 44 Cal.4th at p. 1191, fn. 2), the court upheld the denial of parole because the inmate's lack of insight into his offense and its causes together with the aggravated nature of the offense supported a finding that he was currently dangerous and therefore unsuitable for parole. (*Shaputis, supra,* 44 Cal.4th at pp. 1258–1261 & fn. 20.)

Just as the heinous nature of the commitment offense became a standard reason to deny parole after *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], so too an inmate's lack of insight has become a standard reason after *Lawrence* and *Shaputis*, so much so that it is has been dubbed the "new talisman" for denying parole. (*Shippman, supra,* 185 Cal.App.4th at p. 481 (dis. opn. of Pollak, J.) [quoting a case that was later ordered not to be published].)

In light of Dr. Reynoso's finding it would appear that there is a modicum of evidence that Rodriguez lacks insight into why he allowed his brother to bring a gun into the car before returning to the convenience store. The question remains however, whether Rodriguez's lack of understanding concerning this issue is rationally indicative of current dangerousness. Rodriguez has fully accepted responsibility for his crime. (*In re Vasquez* (2009) 170 Cal.App.4th 370, 385–386 [87 Cal.Rptr.3d 853] [Governor could not ignore

fact that inmate no longer claimed self-defense at the hearings though he had mentioned it in earlier evaluations; later evaluations showed inmate much improved, Governor only relied on early ones]; *Lawrence, supra,* 44 Cal.4th at p. 1224 [reliance upon outdated psychological reports clearly contradicted by petitioner's successful participation in years of intensive therapy, a long series of reports declaring petitioner to be free of psychological problems and no longer a threat to public safety, and petitioner's own insight into her participation in this crime does not supply some evidence justifying the Governor's conclusion that petitioner continues to pose a threat to public safety].)

In *Shaputis, supra,* 44 Cal.4th 1241, the defendant shot and killed his wife. The California Supreme Court determined that "some evidence in the record support[ed] the Governor's conclusion that [Shaputis] remain[ed] a threat to public safety in that he ha[d] failed to take responsibility for the murder . . . , and despite years of rehabilitative programming and participation in substance abuse programs, ha[d] failed to gain insight into his previous violent behavior . . . ." (*Id.* at p. 1246.) Although the evidence was to the contrary, Shaputis nevertheless insisted the shooting had been an accident. The Supreme Court determined that, due to Shaputis's attitude and prior conduct, the commitment offense was not "an isolated incident, committed while [Shaputis] was subject to emotional stress that was unusual or unlikely to recur. . . . Instead, the murder was the culmination of many years of [Shaputis's] violent and brutalizing behavior toward the victim, his children, and his previous wife." (*Id.* at p. 1259, citation omitted.) In addition, Shaputis had "found 'inexplicable' his daughters' prior allegations of molestation and domestic violence [and] had a flat affect when discussing these allegations." (*Id.* at p. 1252.)

As *Shaputis* illustrates, a "lack of insight" into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. (*Shaputis, supra,* 44 Cal.4th at pp. 1260, 1261, fn. 20; *Lawrence, supra,* 44 Cal.4th at pp. 1214, 1228; *Lazor, supra,* 172 Cal.App.4th at p. 1202.) Thus, an inmate's "lack of insight" can provide a logical nexus between the gravity of a commitment offense and a finding of current dangerousness.

However, this case is not *Shaputis, supra,* 44 Cal.4th at pages 1251–1252, where the defendant had a " 'schizoid quality to interpersonal relationships' "; Rodriguez has no such history.

■ In *Shaputis*, the California Supreme Court recognized that "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Shaputis, supra*, 44 Cal.4th at p. 1260, fn. 18.)

Nevertheless, the relevant inquiry for a reviewing court is whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor. (*Lawrence, supra*, 44 Cal.4th at p. 1221; accord, *Shaputis, supra*, 44 Cal.4th at p. 1255.)

Here, the Governor relied on a selected excerpt from Dr. Reynoso's 2008 mental health evaluation in which she stated that Rodriguez lacked a clear understanding as to the causative factors behind his criminal actions, to conclude that Rodriguez lacked insight into his crime. Nevertheless, this evidence is indicative of a current dangerousness only if it shows a *material* deficiency in Rodriguez's understanding and acceptance of responsibility for the crime.[9]

The record shows Rodriguez was not the actual shooter in this case. Thus, Rodriguez's "criminal actions" to which Dr. Reynoso referred were as an accomplice allowing his brother to bring a gun into his car. The record does not show that Rodriguez has ever denied he was guilty of murder or that his actions as the driver of the car were any less culpable than his brother

---

[9] *In re Singler* (2008) 169 Cal.App.4th 1227, 1243 [87 Cal.Rptr.3d 319] (Board's finding was not based on a demonstrable lack of insight or lack of sufficient insight into a material aspect of offense and its causes), *In re Dannenberg* (2009) 173 Cal.App.4th 237, 255–256 [92 Cal.Rptr.3d 647] (psychological reports reflected that the defendant had gained a great deal of insight into his offense, had acquired skills to enable him to avoid violence in the future, and he was not in need of further therapy. Although the Governor believed that these reports were wrong, the Governor's view was not evidence that the defendant lacked insight or, that he was currently dangerous), *In re Rico* (2009) 171 Cal.App.4th 659, 678–679 [89 Cal.Rptr.3d 866], abrogated on other grounds in *Prather, supra*, 50 Cal.4th 238 (court rejected a claim a lack of insight could be inferred from the defendant's failure to discuss his crime, insight, or remorse), *In re Roderick* (2007) 154 Cal.App.4th 242, 271–273 [65 Cal.Rptr.3d 16] (evidence showed that the defendant had a limited capacity either to understand or to explain the mechanisms that led to his criminality, but this limitation was a known quantity and has been factored into his risk assessment. Defendant's responses reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame), guide our view that "lack of insight" when it is invoked as a reason to deny parole must be based on an identifiable and material deficiency in the inmate's understanding and acceptance of responsibility for his or her commitment offense.

Manuel.[10] The fact that he may not fully understand why he allowed his brother to bring a rifle into the car is not a material deficiency in Rodriguez's understanding and acceptance of responsibility for the crime.

Here, the Governor, in an attempt to invoke the Supreme Court's *Shaputis* decision, took an isolated piece of evidence from the record and attempted to evaluate it in a vacuum; then, failed to articulate why this fact demonstrates that Rodriguez poses an unreasonable risk of danger if released. In light of Dr. Reynoso's additional findings bearing directly on Rodriguez's lack of danger to public safety and her conclusion that future "treatment should not be considered mandatory as a prerequisite to parole consideration" we cannot conclude that in this case the cited evidence shows current dangerousness. Furthermore, Rodriguez's purported inability to gain or articulate a better understanding of his behavior is a known factor, which according to Dr. Reynoso, does not negatively affect his suitability for parole.

In light of language difficulties,[11] and Rodriguez's level of education as noted by the Board, we conclude that some evidence of lack of insight into his criminal actions in allowing his brother to bring a gun into the car is not a rational indicator that Rodriguez would unreasonably endanger public safety if released. (See *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931].)

Finally, the Governor noted that Rodriguez had "limited involvement in self-help and therapy over the years," and that Rodriguez could benefit from "additional . . . participation in self-help and therapy." Yet, the Governor noted that Rodriguez had participated in education classes and some "self-help and therapy classes, including Alcoholics Anonymous and an array of health classes." Thus, the only interpretation of these juxtapositions must be that Rodriguez needs more therapy or must read more self-help books to gain better insight.

The record shows that Rodriguez participated in adult basic education programs to improve his English and general education from 1997 to 2006, as well as other self-guided educational reading programs, and several 12-step programs, but as the Board found, Rodriguez had limited opportunities to programs in prison because of his education level.[12]

---

[10] Both the 2006 and 2008 psychological evaluations note that Rodriguez accepts full responsibility for his role in the commitment offense.

[11] Rodriguez was assisted by an interpreter both during the 2008 hearing before the Board and during his evaluation by Dr. Reynoso.

[12] It appears that Rodriguez only completed third grade in his native Mexico and reached a "learning plateau" in 2006.

We find nothing in the governing regulations that require any minimum quantity of rehabilitative programming. More importantly, the significance of rehabilitative programming comes into play only when *after years of such programming* a prisoner is unable to gain insight into his antisocial behavior *despite* those years of therapy and rehabilitative programming. (See *Shaputis, supra*, 44 Cal.4th at p. 1260.)

While it is undoubtedly true that we could all gain better insight into our actions, again, missing from the Governor's decision is how this cited deficiency constitutes a basis for determining that currently Rodriguez would present an unreasonable risk of danger to the public if released.

■ In sum, we have searched the record, as did the superior court, and have determined that the Governor's decision to reverse the Board's finding that Rodriguez is suitable for parole, is not supported by the requisite "some evidence" in the record that Rodriguez currently presents an unreasonable risk of danger to the public. The Governor has failed to make the requisite connection between his findings and the conclusion that Rodriguez is currently dangerous. The superior court properly granted the petition for a writ of habeas corpus.

The Attorney General argues that this case must be remanded to the Governor and that the superior court's order granting Rodriguez immediate release should be reversed. Respectfully, we disagree. In *Lawrence, supra*, 44 Cal.4th 1181, which addressed a Governor's reversal (*id*. at p. 1190), the Court of Appeal had ordered the inmate's immediate release, without return to the Governor for further consideration. (*Ibid*.) The Supreme Court affirmed. (*Id*. at p. 1229.) Accordingly, we must conclude that return to the Governor is not the proper remedy.

■ As this court noted in *In re Dannenberg, supra*, 173 Cal.App.4th 237, "Both the Second District Court of Appeal and the Third District Court of Appeal have rejected the contention that a remand to the Governor is appropriate under these circumstances. 'Because we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor would amount to an idle act. [Citation.]' [Citation.] '[W]here, as here, it is determined there is not "some evidence" in the record to support the Governor's decision to overrule the Board's grant of parole, the proper remedy is to vacate the Governor's decision and to reinstate that of the Board.' [Citation.]" (*Id*. at p. 256.)

## *Disposition*

The trial court's grant of Rodriguez's petition for writ of habeas corpus is affirmed. The Governor's decision reversing the Board's 2008 decision granting Rodriguez parole is vacated and the Board's parole release order is reinstated.

Rushing, P. J., and Premo, J., concurred.