[No. A133492. First Dist., Div. Three. Dec. 5, 2012.]

In re JOE DENHAM on Habeas Corpus.

**COUNSEL**

Jennifer M. Sheetz, under appointment by the Court of Appeal, for Petitioner Joe Denham.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Anya M. Binsacca and Jennifer G. Ross, Deputy Attorneys General, for Respondent the People.

**OPINION**

**JENKINS, J.**—Petitioner Joe Denham was convicted in December 1983 of first degree murder of Jose Mendoza, attempted murder of John Tappan, two counts of robbery (both victims), and two counts of kidnapping (both victims). The jury also found true as to each count an arming enhancement pursuant to Penal Code section 12022, subdivision (a).[1] Denham is currently serving an indeterminate sentence of 31 years to life.[2] His minimum eligible parole date was September 21, 2003.

In April 2010, at a fourth parole hearing, the Board of Parole Hearings (hereafter the Board) denied Denham's request for parole and deferred a new parole hearing for three years. In his petition, Denham challenges the Board's finding that he poses a current risk of danger to society if released on parole. He also contends the Board's decision to apply the 2008 amendments to Penal Code section 3041.5 (known as and hereafter referred to as Marsy's Law) to defer his next parole hearing for three years violated federal and state constitutional prohibitions against ex post facto application of the law.

After the 2010 hearing, the Board denied parole based on (1) the gravity of the offense, (2) Denham's "escalating pattern of criminal conduct," (3) his

---

[1] Penal Code former section 12022, subdivision (a)(1), read, in pertinent part: "[A]ny person who is armed with a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless the arming is an element of that offense. This additional term shall apply to any person who is a principal in the commission of a felony or attempted felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm."

[2] Because of a 1987 conviction for possession of a weapon in prison, Denham is subject to a two-year prison sentence after he is paroled on his life sentence.

unstable social history, as manifested by his having been a drug dealer before he was incarcerated, and (4) his past mental state and attitude towards his crime because he is in "denial" and "lacks insight into the causative factors of his conduct, even today."

Denham unsuccessfully sought writ relief in the Alameda County Superior Court and then filed a writ petition in this court on October 21, 2011. After requesting and reviewing the parties' informal briefing, we issued an order to show cause and directed that counsel be appointed on Denham's behalf on January 5, 2012. We have reviewed the return and traverse and considered the oral arguments of counsel. For the reasons explained below, we remand the case for a new hearing before the Board.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Life Crime*

The 1983 probation officer's report summarized the facts of the life crime, in pertinent part, as follows: "On December 2, 1982, John Tappan went to the Campbell Village Projects (Village) with a black male, known to him by the name of 'Gator', in order to buy some tires. . . . Tappan parked his car in a lot located at the corner of Tenth and Campbell Streets while 'Gator' went to look for the tire connection. 'Gator' never returned. In the meantime, Tappan fell asleep in his car with the car radio on. Tappan woke up to find his battery dead. It is now sometime between 5:00 and 6:00 p.m. Tappan attempted to get a 'jump' for his car, but was unable to get any assistance from the locals at Campbell Village. At some point, Tappan . . . went to the Standard Gas Station at the corner of Seventh and Cypress Streets where he met gas station attendant, Jose Mendoza. Tappan paid Mendoza $10.50 for road service and both victims returned to Tappan's car with jumper cables in hand. [Mendoza] took his car to the scene so as to enable him to 'jump' Tappan's car off the battery. While they were attempting to start Tappan's car, five to six people surrounded them with at least two guns. Tappan was robbed of some jewelry, a knife and two guns that he had on him at the time. Mendoza had a buck knife that he used at work removed from him. Tappan identified Willie Johnson and Joe Denham as two of his assailants at that time. After Tappan was robbed, it was suggested that he was one of 'Grem's boys' by one of [the] attackers, that reference being to Oakland Police Department Vice Officer Everett Gremminger. Mendoza was known to these defendants due to the fact of his employment at the gas station that the defendants had been known to frequent. [¶] At that point, the victims were marched across the street to Prescott School to an enclosed courtyard area. During the walk across the street, defendants Willie Johnson, Michael Aaron, Joe Denham, Richard Bell and Bernard Adams were spotted by Louiell Davis, a lookout

for the dope gang they all belong to. Davis saw defendants march Mendoza and Tappan into the schoolyard. A few minutes later, screams and gunshots were heard by Davis, who subsequently saw people running from the schoolyard. [¶] Mendoza was stabbed and shot numerous times and was already dead at the time police arrived at the scene. Tappan was stabbed numerous times and was shot in the face, the bullet lodging in his neck after deflecting off his jawbone. Tappan survived the attack."

### B. *Previous Parole Proceeding*

Before his third parole hearing in 2009, Denham was interviewed by a forensic psychologist. In describing his participation in the life crime, Denham said he "didn't really know what was going on," when he initially joined the men. He described his participation by saying he followed the group as they led the two victims to a school yard and he punched one victim one time after being challenged by another assailant to "do something." The psychologist expressed concern about the fact that Denham "did not discuss any of the underlying factors behind why he associated with the co-assailants in the first place. He did not provide any detailed discussion regarding why he felt the need to 'keep the image that I was with them' on that day, and he did not provide any response other than 'I don't know' when he was directly asked why he did not make some effort to intervene. Instead, Mr. Denham continues to assert he was unaware of what was about to take place and unaware of the potential for violence." In the "[c]linical or more current and dynamic domain of risk assessment," the psychologist indicated Denham displayed "mild limitations in his verbalized insight into the causative factors underlying his involvement into the life crime."

At the 2009 parole hearing, the Board members granted Denham a release date for parole. At that time, Denham admitted he threw "a couple of punches at Mr. Tappan." When asked why he had participated in the crimes, Denham said he wanted to be accepted by the guys in the neighborhood. He denied seeing anyone with guns or knives and he only heard the gun, but did not see who did the shooting because he ran. The Board members expressed concern about Denham's explanation of his involvement in the crime, but felt the nexus between the committed crimes and his current threat to public safety did not rise to the level of demonstrating he lacked insight into his crime sufficient to justify denial of parole on that basis.

However, the then Governor reversed the Board's 2009 decision, and denied Denham's request for parole. In pertinent part, the Governor found Denham's explanations for his life crime consistently minimized his conduct by characterizing himself as only a marginal or passive participant in the crime, indicating he had not gained sufficient insight into the circumstances

that led to the murder and he had not fully accepted responsibility for his criminal conduct. "The evidence of Denham's lack of insight and refusal to accept full responsibility for the murder renders his life offense still relevant to [a] determination that Denham poses a current, unreasonable risk of danger if released to the public because he cannot ensure that he will not commit similar crimes in the future if he does not completely understand and accept total responsibility for his criminal conduct."

### C. 2010 Parole Proceeding

Before his fourth parole hearing in 2010, Denham was again interviewed by a forensic psychologist. Denham again described the nature of his conduct leading to the life crime. While walking in the neighborhood he ran into some men he had come to know after arriving in Oakland. He gathered the men were waiting for someone they believed was involved in a drug deal. Eventually the men converged on the two victims and Denham recalled recognizing Mendoza from the gas station. Denham also recalled closing the trunk of a car during the search and robbery of Tappan and then walking with the group to the enclosed courtyard across the street. Denham reported that Mendoza was taken into a nearby ravine while Tappan was assaulted in the courtyard. Denham admitted throwing a couple of punches at Tappan because Denham believed it was expected of him, and he wanted to gain acceptance from the group. Denham denied he had a weapon and when he heard gunshots from the ravine he ran from the scene. Denham admitted he acted irresponsibly, particularly in failing to intervene or seek help for the victims. He recalled being afraid at the time, knowing that what was happening was wrong and feeling unable to do the right thing. He reported a growing sense of shame over the years as he has accepted fuller responsibility for his life crime. He now believed it was peer pressure and even callous self-interest that guided his actions that day and after doing a "12-Step moral inventory," he had begun to take more responsibility for what happened to the two victims. Denham had come to understand how vulnerable he was on relocating from Mississippi to California and that he had allowed himself to be consumed and manipulated by his environment. He was also aware of how his criminal lifestyle during the previous year before the life crime made it easier for him to participate in what he understood was a callous attack on two unarmed victims.

The psychologist placed Denham in the low range for risk of violent recidivism and recidivism in general. However, the psychologist hoped Denham's "ongoing participation in pro-social activities will assist him in a greater process of introspection which will lead to taking greater responsibility for his life crime and improving insight into his past choices." In addressing the Governor's concerns, the psychologist reported, in pertinent

part, that Denham "has admitted participating in the assault of Mr. Tappan during his life crime, saying that he struck Mr. Tappan at least twice. He has maintained that when the shooting began he ran from the scene. He has admitted acting irresponsibly that day, particularly in failing to intervene or to seek help for both victims and he believes it was peer pressure and callous self-interest that guided his actions that day. He reported that he has begun to take more responsibility for what happened to both his victims. . . . Denham acknowledged having chosen to participate in an antisocial lifestyle of selling drugs. He described himself as vulnerable and needy as an outsider and newcomer to the area, that he was seeking the acceptance of drug dealers and that when faced with a moral choice he thought only of himself and he failed to do the right thing."

At the 2010 Board hearing, Denham gave an account of his tangential participation in the crimes leading to his life term. He had left his grandmother's house and ran into a group of men with whom he normally hung out. He started to talk to them and asked them what they were doing. The group said some guys had been "hanging out watching them sell drugs." When Tappan and Mendoza arrived, someone in the group said "these are the peoples that we was waiting on." Tappan was trying to get his car jumped. The group approached "the car" and started to question Tappan and Mendoza. But Denham really did not know what was going on. Denham did not really hear the questions, but he assumed Tappan and Mendoza were asked what they were doing in the Village. After a while, either Tappan or both Tappan and Mendoza were searched. When asked how the group had the authority to search them, Denham replied, "I don't know. They just searched them. I don't know if they had the authority to search them but they did it though." Denham claimed he "was standing to the side" while the victims were searched and the group noticed that Tappan had some weapons and someone took the guns. Someone also searched Tappan's car, but Denham did not know what they were looking for inside the car. While the group was waiting for Mendoza to be searched, the group was still questioning Tappan and Mendoza, but Denham did not know what questions were being asked because he was not close enough to hear them. After about 15 or 20 minutes, someone asked Tappan what he was doing in the Village. Tappan said he was there to "cop some drugs or something." Denham was "still standing to the side just—because [he] really [did not] know what was going on. So, [he is] just waiting." Then someone said, "[J]ust line up," to Tappan and Mendoza. Everyone moved across the street "all in a group." Mendoza and Tappan were in front with a couple of guys, and Denham was behind the last person in the back. Once across the street, Mendoza was taken behind a partition, and Denham and several others remained with Tappan outside in the courtyard. Denham admitted something was going on behind the partition but he never went back there. A couple of guys asked Denham why he did not act like he

wanted to be involved, and so Denham "threw a couple punches on" Tappan, and then Denham ran after he heard the gunshots. At that point Tappan was on his back in the courtyard. Denham went to his grandmother's house, and he was arrested several days later.

In response to questions from the Board members, Denham admitted that some things were taken from Tappan's person. He denied searching the men and attributed his conviction for robbery to the fact that he had closed the trunk of Tappan's car. Denham believed his sentence was fair because when he heard gunshots, he left and did not do anything to prevent it or report it, and even when he knew something was wrong, he did not intervene and try to stop it. Denham took full responsibility for not trying to prevent what took place and not informing the proper authorities that an incident had occurred. Denham had not tried to prevent the criminal conduct because he was trying to fit in and interact with the activity that was outside his grandmother's house, "drug activities, quick money, fast lifestyle," and he "hesitated on making the correct decision."

The Board members were also informed that before being sentenced for the commitment offense, Denham had suffered no criminal convictions. As an adult, he was arrested for drug possession in 1981, but the case was not prosecuted. That same year he was also arrested for assault with a deadly weapon, but that case was also dismissed. Denham had been free of serious discipline in prison since 1987. In 1986 he was written up for drug/alcohol possession, but no criminal charges were filed against him. In September 1987, he was disciplined for disobeying a direct order and he was convicted of possessing a weapon while in custody, for which two additional years were added to his sentence. Denham explained that he had possessed a weapon in 1987 due to frequent attacks against African-Americans in the prison where he was incarcerated. He recognized this explanation of his offense did not excuse it.

As to his employment history, before committing his life offense Denham had worked as a steel cutter and also worked in a chicken packing plant. In prison he developed skills as an optician. He is certified as a customer service specialist and as an optician (by the American Board of Opticianry). At the time of his 2010 parole hearing he had been a certified optician for the last 11 years and worked in the field for the last 15 years. His performance at his prison job was commendable. One correctional officer described him as "always reliable, trustworthy, respectful, hard-working and dependable," his "work ethic and behavior" was "excellent." Although Denham graduated from high school, he also earned a GED in 1994 while in custody. He has since earned approximately 45 credits towards his associate of arts degree.

Denham also had actively taken advantage of various self-help opportunities in prison. These included a codependency program, an addiction recovery workshop, men's violence prevention, stress management, tobacco cessation support program, Project Pride, and the Personal Accountability Program. He also participated in Alcoholics Anonymous, Narcotics Anonymous, the Twelve-Step Program, and various Muslim programs.

At the 2010 parole hearing, Denham presented the Board with alternate parole plans. He planned to live with his sister in Oakland, California. His family and friends had pledged both financial and emotional support. He had also arranged for possible housing and programming at various transitional housing programs. He intended to be involved with both Alcoholics and Narcotics Anonymous. In addition, he had been offered employment as an optician. As an alternative, he had developed a business plan to sell his own handcrafted leather products.

The Board members denied parole, finding that the "the first consideration which weighs heavily against suitability is the gravity of the commitment offense." After reciting the facts of the life crime, the presiding commissioner stated: "This was a calculated crime, dispassionate. These victims were unarmed at the time they were—one was killed, one was injured. They were marched from one location to the other location after they were robbed of their belongings, and savagely attacked and one killed. It was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. Mr. Denham had options. He [chose] not to exercise those options. He didn't come to the aid of either victim. He allowed this crime to be completed to a conclusion. The motive for this crime is very trivial. The relationship to the commitment offense, this is one of robbery, monetary gain."

The Board members also relied on other factors in reaching their decision, including "the criminal history that we reviewed during the hearing today," and Denham's social history. "Mr. Denham has an escalating pattern of criminal conduct that include[d] arrests for substance abuse, drug issues. He was also arrested but not convicted for possession of drug and alcohol while in prison. He was convicted for possession of a weapon and received an additional two-year sentence. This inmate has an unstable social history in the fact that he was involved in drug sales prior to incarceration."

The Board members also found Denham's "past mental state and attitude towards the crime" rendered him unsuitable for parole. In addressing this factor, the presiding commissioner stated: "Today we had testimony, the same as the last testimony in the hearing, of Mr. Denham's involvement in this commitment offense. Mr. Denham [testified] that he stood by while the

victims were searched, in his words. He stood by at the end while they were marched over to the courtyard of the school. He stood by while one victim was marched into an area and shot and stabbed and killed. He stood by. When they said, run, he ran away from the scene when he heard the shots. . . . During the last hearing, although it was a grant, the last Board did wrestle with the issue of his location and his version of the commitment offense. Well, today, I'm not wrestling with anything. I don't believe him. I just don't believe him. I grew up in the ghetto. I know how things occur. This inmate said he's involved in drug sales, he's involved with these individuals that did this, but he [does not] know what happen[ed], that he ran. He didn't know that they were going to perpetrate violence against these two victims? And Mr. Tappan says, well, Mr. Denham was part of it. How can Mr. Tappan identify Mr. Denham if that's all he did? I have some serious, serious reservations about Mr. Denham's versions of this commitment offense. And that's what judges ask us to do. Give your honest assessment based on the evidence before you today to determine his current suitability. His current suitability, in my personal opinion, is he is in denial. He lacks insight into the causative factors of his conduct, even today. He is minimizing his involvement in this commitment offense. He wants us to believe that he does not know what was going to happen to these two individuals. He knew all these guys. He knew their propensity. I know how it works. I was in the projects. I know how it works. He knew. He knew what they were capable of. And he knew what his actions were. But here today, all we ask him is to have current insight. We are judging current dangerousness to society. And there's a correlation between current dangerousness and this commitment offense, in spite of *In re Lawrence*, because of the heinous, atrocious nature of this crime. It was brutal. . . . One was executed, one was an attempted execution. Kidnapped. Moved from place to place. I have serious reservations about Mr. Denham and his veracity. I think he needs to go and get some insight into the causative factors of his conduct. Some current insight. That's my assessment of this commitment offense. *In re Shaputis* supports my decision. I don't think he's credible."

As to other factors concerning Denham's suitability for parole, the Board members commented that Denham's "most recent psychological report is favorable." His accomplishments in prison were "definitely positive," having had no serious writeups since 1987. Since 2006, Denham had been involved in many programs, and his rendition of what he learned in those programs appeared "to be very strong and very positive." Denham's parole plans were found to be "realistic," including job opportunities and transitional housing. "The Board has no concerns with his parole plans at this time."

The Board members rejected Denham's claim that because his crimes were committed in 1982, the application of Marsy's Law to set the deferral date of

his next parole suitability hearing would violate state and federal constitutional prohibitions against ex post facto laws. Pursuant to Marsy's Law, the Board found there was "clear and convincing evidence" that Denham did not require a period of incarceration of 15 additional years before his next parole hearing. "He has positive programming. He has not been in trouble since, I believe, 1987 . . . It's been a long time. No serious misconduct. Stable social history. The Panel has no substantial doubt that, based on these circumstances, he does not require a 15 year denial. We then went to the next category of ten years. And by clear and convincing evidence, we have no substantial doubt that for the reasons cited before, [Denham] [does] not require a more lengthy period than the next threshold of seven years. And while we want to commend you for your positives, on balance, the circumstances that make you unsuitable for parole, which ha[ve] already been discussed with you, heavily outweigh the positive aspects of your case. And after weighing all the evidence presented here today we're recommending three additional years for the reasons we've already articulated here today. We recommend that you remain disciplinary-free, you continue to be available, be involved in your vocation, self-help programs. Your educational programs have been outstanding. And cooperate with the clinicians in the completion of the clinical evaluation." Denham was also told he could "request the Board conduct [his] next hearing earlier than the denial period . . . . issued here today provided there is new information or change in circumstance that establish a reasonable likelihood that [he did not]˙ need additional time. You don't have to wait three years."

### D.  *Petitions for Writ of Habeas Corpus*

Denham unsuccessfully sought writ relief in the trial court and then filed a new petition in this court in October 2011. We issued an order to show cause and directed that counsel be appointed on Denham's behalf. The People filed a return, and Denham filed a traverse to the return.

### DISCUSSION

■  The Board's decision is governed by Penal Code 3041 and California Code of Regulations, title 15, section 2402. Penal Code section 3041 mandates that the Board "shall" set a parole release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." (*Id.*, subd. (b).) As set forth in the regulations, "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

(Cal. Code Regs., tit. 15 (hereafter Regulations), § 2402, subd. (a).) In making its determination, the Board must conduct "an individualized inquiry" into the inmate's suitability for parole, considering the entire record, including the commitment offense, the inmate's progress while incarcerated, and the insight he has developed into his past conduct. (*In re Shaputis* (2011) 53 Cal.4th 192, 209, 219–221 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis*).)

In reviewing a denial of parole, we determine whether there is " 'some evidence' " to support the Board's decision that the inmate constitutes a current threat to public safety. (*Shaputis, supra*, 53 Cal.4th at p. 198 [court "reaffirm[s] the deferential character of the 'some evidence' standard for reviewing parole suitability determinations"].)[3] "[U]nder the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board]. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board]. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (53 Cal.4th at p. 210.) Denham argues that "[w]ith the exception of the facts that support a part of [the Board's] analysis about the egregious nature of the crime (which alone are not rationally indicative of current dangerousness), the Board arbitrarily relied on incorrect factual contentions and its own guesswork." On this record, we are compelled to agree with Denham.

There is no question that the life crime was egregious As the Board noted, the victims were surrounded, relieved of any weapons, and marched from one location to another where they were brutally assaulted and one victim was murdered. The Board found the motive for the commitment offense was monetary gain. Although that might have been an incidental motive, there is evidence to suggest the primary motive for the murder was to eliminate someone who was believed to be cooperating with a narcotics agent. If true, that motive would underscore the egregious nature of the crime. However, even an egregious commitment offense may only be relied on to deny parole if it is predictive of current dangerousness. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1221 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*)

---

[3] Because we are bound by our Supreme Court's decision (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), we reject Denham's contention that the " 'some evidence' standard should not apply to a [c]ourt's review of [a] parole decision" for life prisoners.

["the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense"].) The aggravated nature of a crime is not, by itself, some evidence of current dangerousness unless there is also evidence that there is something about the commitment offense which suggests the inmate still presents a threat to public safety. (*Id.* at p. 1214.)

The Board's conclusion that Denham lacked insight is the lynchpin of its decision as the commitment offense is only relevant if his current mental attitude establishes that despite his excellent and long-standing intervening conduct, he would still pose an unwarranted risk to public safety if released. The Board may properly consider an inmate's level of insight in determining parole suitability. (*Shaputis, supra*, 53 Cal.4th at p. 218.) "The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis, supra*, 53 Cal.4th at p. 218.) As explained above, in this case, Denham's purported lack of insight is the sole bridge that potentially makes the commitment offense relevant to assessing the risk he would pose to public safety if paroled. Unless there is some evidence to support the Board's conclusion that Denham lacks insight into his life crime, consideration of that factor was inappropriate.

The Board apparently believed that Denham's claim he played a peripheral role in the crime shows he is minimizing his involvement and failing to take responsibility for the crime, commensurate with the part he actually played in it. However, we see no evidentiary foundation for the Board's belief. Where an inmate's denial of guilt is factually unsupported or otherwise incredible, it may be taken as evidence of lack of insight. (*Shaputis, supra*, 53 Cal.4th at p. 216.) For example, in *Shaputis*, the defendant's claim that he killed his wife by accident was contradicted by the facts that the hammer of the gun had to be manually cocked before the trigger could be pulled and a transfer bar required a person to pull and hold back the trigger in order to fire the gun. (*Id.* at p. 201.) There was also evidence showing he delayed in calling for emergency assistance for his wife. (*Ibid.*) In other words, there were specific facts to support the conclusion that Shaputis was not honest and forthright in claiming that what had happened had been accidental. Because his distortions, if they had been believed, all tended to indicate he was less culpable for the crime, there was evidence to show he was minimizing his culpability. (See *In re Coronel* (Cal.App.).)

■ In this case, the Board cites no evidence establishing that Denham's participation in the crime was anything other than what he described at the 2010 parole hearing. Indeed, the only evidence in the record that bears on the credibility of Denham's rendition tends to corroborate it. He admits to punching Tappan a couple of times to establish his credibility with the group. Although we do not have any witness testimony from the trial, the record does include the trial sentencing minutes. At that proceeding, counsel for Denham and some of his coparticipants, and the trial prosecutor made uncontradicted references to the fact that one of Denham's coparticipants was the main instigator, Denham and a coparticipant were with Tappan while other coparticipants were behind a wall with Mendoza, and the coparticipant with Denham accused the latter of "do[ing] nothing." Had Denham been a major actor, it is unlikely a coparticipant would have accused him of not doing enough to facilitate the crime. The fact that Tappan identified Denham as one of his assailants is also fully consistent with Denham's admission that when the group went into the school yard, he stayed with Tappan while other members of the group went behind a wall with Mendoza. Thus, it is no surprise that Tappan was able to identify Denham. We therefore conclude "the record cannot be reconciled with the conclusion [Denham] minimized his responsibility. . . . [T]he required 'nexus between the evidence and the ultimate determination of current dangerousness' [citation] is absent." (*In re Sanchez* (2012) 209 Cal.App.4th 962, 973 [147 Cal.Rptr.3d 330] (*Sanchez*); see *In re Hunter* (2012) 205 Cal.App.4th 1529, 1539–1540, 1544 [141 Cal.Rptr.3d 350].) The Board's speculation as to what Denham should have known about his coparticipants' intentions "prevented any meaningful evaluation of the evidence and led instead to the unsupported and therefore arbitrary conclusion [Denham] rejected responsibility for his actions." (*Sanchez, supra,* 209 Cal.App.4th at p. 974.) ■ A Board's "mere refusal to accept . . . evidence [showing understanding and remorse] is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*In re Ryner* (2011) 196 Cal.App.4th 533, 549 [126 Cal.Rptr.3d 380]; see *In re Rodriguez* (2011) 193 Cal.App.4th 85, 95 [122 Cal.Rptr.3d 691] [denial of parole may not be based on hunches or intuition].)

■ We also conclude the denial of parole is not supported by other factors mentioned at the parole hearing. The Board relied on Denham's "escalating pattern of criminal conduct," which was purportedly evidenced by his preincarceration arrests for which he sustained no criminal convictions, and his 1987 conviction for weapons possession while in prison. The regulations concerning parole suitability say nothing explicitly about escalating criminal conduct. Among the factors tending to show unsuitability for

parole is "Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." (Regs., § 2402, subd. (c)(2).) The regulations do, however, provide that the Board is to consider all relevant, reliable information, including "past criminal history, including involvement in other criminal misconduct which is reliably documented." (Regs., § 2402, subd. (b).) Thus, the Board was entitled to recognize that Denham's criminal conduct escalated from drug and weapons possession to murder. However, where the Board considers that factor to be predictive of current dangerousness, it must articulate why that is the case. (*In re Roderick* (2007) 154 Cal.App.4th 242, 264 [65 Cal.Rptr.3d 16].) " '[I]mmutable facts such as an inmate's criminal history' . . . do not by themselves demonstrate an inmate '*continues* to pose an unreasonable risk to public safety.' (*Lawrence, supra*, 44 Cal.4th at p. 1221, original italics.)" (*Sanchez, supra*, 209 Cal.App.4th at p. 975.)

■ In denying parole, the Board also relied on Denham's "unstable social history" based on the fact that "he was involved in drug sales prio to incarceration." However, Denham's involvement in selling drugs does not address his social history as that factor is defined in the regulations. An "unstable social history" is defined as a situation where "[t]he prisoner has a history of unstable or tumultuous relationships with others." (Regs., § 2402, subd. (c)(3).) Conversely, "a stable social history" is defined as a situation where "[t]he prisoner has experienced reasonably stable relationships with others." (*Id.*, § 2402, subd. (d)(2).) Here, there is no evidence of any tumultuous or particularly unstable relationships. Indeed, when considering the date of Denham's next parole hearing, the Board found by clear and convincing evidence that public safety did not require an additional 15-year period of incarceration before his next hearing because of Denham's "[s]table social history." Denham's involvement in selling drugs, however, was certainly a factor that the Board could consider in assessing parole suitability. (Regs., § 2402, subd. (b).) But given Denham's lack of any substance abuse history since 1986, his long-standing participation in 12-step programs, and his development of prosocial vocational skills, the Board must explain how his preincarceration history as a drug dealer predicts his current dangerousness.

Because we are ordering the Board to conduct a new parole suitability hearing, Denham's ex post facto challenge to the application of Marsy's Law is moot. The general legal issue will not escape appellate review as the Supreme Court has granted review in several cases challenging on ex post facto grounds the application of Marsy's Law to a prisoner convicted and sentenced before the law went into effect. (*In re Rodriguez* (2011) 199 Cal.App.4th 1158 [132 Cal.Rptr.3d 182], review granted Jan. 18, 2012, S197961; *In re Aragon* (2011) 196 Cal.App.4th 483 [126 Cal.Rptr.3d 286],

review granted Sept. 14, 2011, S194673; *In re Smith* (2011) 196 Cal.App.4th 468 [128 Cal.Rptr.3d 179], review granted Sept. 14, 2011, S194750; *In re Vicks* (2011) 195 Cal.App.4th 475 [125 Cal.Rptr.3d 627], review granted July 20, 2011, S194129; *In re Russo* (2011) 194 Cal.App.4th 144 [124 Cal.Rptr.3d 444], review granted July 20, 2011, S193197.)

## CONCLUSION

The petition is granted and the matter is remanded for a new parole hearing.

Pollak, Acting P. J., and Siggins, J., concurred.

On December 6, 2012, the opinion was modified to read as printed above.