Filed 1/22/16  P. v. Valentine CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARY VALENTINE,<br><br>    Defendant and Appellant. | A140133<br><br>(San Mateo County<br>Super. Ct. No. SC042969) |

Appellant Gary Valentine, presently serving a three strikes prison term of 26 years to life imposed in 1999, appeals from the denial of his petition for resentencing under Proposition 36, the Three Strikes Reform Act.  He argues that the constitutional guarantee of equal protection of the law is violated by the requirement that a person whose third strike term was imposed for a nonviolent felony be granted resentencing only if he or she does not pose an unreasonable risk of danger to public safety, while a person newly sentenced for a nonviolent felony is entitled to a second strike sentence regardless of current dangerousness.  Additionally, he maintains that the definition of "unreasonable risk of danger to public safety" set forth in Proposition 47, enacted while this appeal was pending, must be applied to his case.  Finally, he contends the trial court erroneously denied his petition based on immutable facts of his past record which had no rational nexus to current dangerousness.  For the reasons explained herein, we reverse and remand for reconsideration of whether appellant currently poses an unreasonable risk of danger.

1

## STATEMENT OF THE CASE

In 1999, appellant was convicted of recklessly setting fire to an inhabited property (Pen. Code, § 452, subd. (b))[1] and sentenced to a prison term of 25 years to life, plus one year for a prior conviction resulting in a prison term (§ 667.5).[2] This court affirmed the judgment.[3]

On December 24, 2012, appellant filed a petition for resentencing pursuant to section 1170.126.

On October 25, 2013, the trial court denied the petition, finding that appellant posed an unreasonable risk of danger to the public.

Appellant filed a timely notice of appeal on October 28, 2013.

## STATEMENT OF FACTS

The facts of the offense underlying appellant's 1999 conviction were described in this court's unpublished opinion filed on September 6, 2000, as follows:

"In March 1998, appellant was living with his wife, Carol Valentine, in a cottage behind her mother's residence. Appellant was an alcoholic. Due to his heavy drinking, he was having marital problems with his wife.

"On the evening of March 19, 1998, appellant told her that he was going to burn the cottage down.[4] Carol decided to stay at her mother's residence that night. Later in the evening, appellant telephoned Carol and told her that 'something bad was going to

---

[1] Further unspecified code references are to the Penal Code.

[2] Appellant was prosecuted for a number of offenses: maliciously setting fire to an inhabited property (§451, subd. (b)); recklessly setting fire to an inhabited property (§ 452, subd. (b)); burglary (§ 460, subd. (a)); assault on a peace officer (§ 245, subd. (c)); attempt to dissuade a witness (§ 136.1, subd. (a)(2)); and receiving stolen property (§ 496, subd. (a)). He was convicted only of the count of recklessly setting fire.

[3] We found that the trial court erred in calculating appellant's custody credits and remanded for amendment of the abstract of judgment to reflect an additional 41 days of custody credits.

[4] "Previously, Carol testified that appellant was speaking incoherently on the night of the fire. At trial, she explained that her earlier testimony was motivated by her desire to protect her husband."

happen.' Approximately 10 minutes later, Carol looked at the cottage window and saw an 'orange glow' in front of appellant's silhouette. She called 911 immediately.

"When police officers arrived at the scene, the area near the cottage door was in flames and the cottage was filled with smoke. Appellant was sitting on the couch about six feet away from the fire, smoking a cigarette. The officers forced the door open, extinguished the fire, and pulled appellant from the cottage. Appellant was intoxicated. He told San Bruno Police Corporal Elizabeth Mariner that he set the fire with lighter fluid because he had an argument with his wife. He acknowledged telling his wife that he 'was going to do it.'

"Inside the cottage, there was a partially full bottle of lighter fluid on a coffee table, and a pile of smoldering pillows, blankets, and other personal items behind the front door. San Bruno Fire Captain Scott Marshall examined the scene of the fire. He concluded that the fire was not an accident. In Captain Marshall's opinion, the fire started after an accelerant was squirted, spilled or splashed onto the pile of personal effects near the door, and the pile was ignited."

In rejecting appellant's claim that his sentence violated the constitutional prohibition against cruel and unusual punishment, we described his criminal history:

"Appellant, who was 49 years old at the time of sentencing, has an extensive criminal history with convictions that have become increasingly serious over time. His criminal record includes a 1968 conviction for joyriding, a 1972 conviction for possession of marijuana, a 1986 conviction for robbery with use of a firearm, a 1986 conviction for bank robbery, a 1987 conviction for voluntary manslaughter, and a 1999 conviction for driving under the influence of alcohol.

"Appellant's crimes involved extremely dangerous conduct. For instance, appellant accomplished the 1986 robbery by threatening the clerk at a toy store with a handgun. In the 1986 bank robbery, appellant threaten[ed] the teller by telling her that he had a ' "magnum" ' in his pocket, and that a bomb was in place that would blow the bank apart. The 1987 conviction for voluntary manslaughter occurred after appellant's gun went off and killed his girlfriend during a drunken fight. In the 1999 drunk driving

3

incident, appellant was driving with a blood alcohol level of .31 percent, and caused collisions involving three different vehicles." We noted that appellant was incarcerated for the majority of the 10 years between his 1986 and 1987 convictions and the 1998 burning of the cottage, meaning the remoteness of the earlier convictions was "no indication of appellant's ability to refrain from criminal conduct," and we commented that he was "a recidivist offender who is extremely dangerous to the public."[5]

At an August 2, 2013, hearing on the resentencing petition, retired Police Officer David Stamer testified that on the evening of the fire in March 1998, he and other officers forced their way into an in-law unit that was in flames, yelling "police, open up." Amid the smoke in the residence, appellant was seated on the sofa smoking a cigarette. The officers ordered him to come out for his safety, but appellant just stared at them. As they forcibly removed appellant from the residence, the officers smelled alcohol about his person. Appellant was committed under Welfare and Institutions Code section 5150.

On July 9, 1998, Stamer responded again to the same residence sometime after 3:00 a.m. and found appellant inside the garage attempting to pry open with a screw driver the door to the attached in-law unit. Stamer called appellant by his first name and ordered him several times to drop the screwdriver. Appellant made a closed fist around the screwdriver with the point sticking out. As Stamer yelled for appellant to drop the screwdriver, appellant ignored the orders and came toward the officers; he continued after Stamer asked if he wanted to be pepper-sprayed and even after Stamer sprayed him, not dropping the screwdriver until Stamer's partner kicked him in the chest, knocking him backwards. There was a struggle as the officers got appellant handcuffed. As they

---

[5] To demonstrate that the commitment offense was a "low-level felony, a wobbler," appellant submitted the factual statement from our prior opinion, the description of facts related in the probation report, and a letter from appellant's wife's mother, the property owner, stating that the damage from the fire was "very minor" and had been repaired. The full probation report was submitted to show that appellant's strike offenses occurred "more than a quarter of a century ago and there have not been any subsequent violent offenses," along with the abstract of judgments for the 1988 robbery and manslaughter convictions, and the presentence report for the 1988 bank robbery conviction.

4

were walking appellant outside, appellant's wife appeared. Appellant looked right at her and angrily stated that he "would be getting out of jail." Stamer asked him if that was a threat and appellant replied, "you bet it is." Appellant was intoxicated. At the police station, he was "extremely belligerent and uncooperative." Stamer never heard appellant say that he did not mean what he said to his wife. Stamer acknowledged that he had not seen appellant in almost 15 years and did not know what he was like at the time of the hearing.

Appellant testified that he spent most of his younger years in a children's home after his parents split up. Around age 18, he had surgery for scoliosis, which entailed fusing his spine and inserting a steel rod. That rod had broken in two, causing nerve damage and impaired mobility. The pain, in his entire spine and radiating down his right leg, was "intense" due to the nerve damage, and for the seven years preceding the resentencing hearing, he had been receiving methadone twice a day, which gave him three to four hours relief after each dose.

About age 18, appellant became a hippy, and started using drugs; he started drinking alcohol much later, around 30. He had been married three times, and had a son from his third marriage. Around 1988, when he was in his late 30's, things "fell apart" for appellant after he and his wife divorced and he was unable to see his son, and he started "really drinking" and also using drugs. He tried to stop himself from drinking by putting himself in rehabilitation programs four or five times, and twice he put himself in mental wards to "detox myself." In late 1988, he was convicted of three "strike" offenses: Robbery of a toy store with a firearm, bank robbery, and voluntary manslaughter. The victim of the voluntary manslaughter was his girlfriend. Appellant testified that she grabbed a gun he had lying "out in the open" and pointed it toward her back to shoot herself. He grabbed the gun from her and put it back where it had been, thinking she just wanted attention. He turned to do something else, then heard a shot and turned back to see she had shot herself in the chest. He was arrested and his attorneys negotiated a disposition for all three offenses under which appellant pled no contest to

5

voluntary manslaughter and his sentence was run concurrent with his sentences on the other offenses.

Appellant spent about eight years in federal custody. While there, he earned 62 college credit hours, many of which were for drug and alcohol counseling. When released from federal custody, appellant spent three months in a halfway house in Arizona and then was on parole. In 1995, appellant turned himself into his parole officer after drinking for about three weeks. He served another nine months in federal prison for this violation and was released to a halfway house in San Francisco. He then remained sober from the time of his release until his marriage to his fourth wife, Carol. He worked as a fundraiser.

Appellant started drinking again a couple of months before the fire incident that led to his state prison term: He thought he "could have a beer" but "a beer ended up my downfall." Carol was spending time in the main house because of appellant's drinking. With respect to the fire, appellant testified, "what I believe happened is I thought that I was lighting a cigarette or something. And I caught the curtains on the door on fire. But maybe I—maybe something else happened. I don't know. I was pretty messed up." All he remembered was sitting on the couch and the fire fighters coming in. Appellant was not immediately arrested for the burning incident. He put himself into an inpatient program at Walden House, where he previously had been an outpatient at the direction of his federal parole officer. About a month into the program, appellant learned that a warrant had issued for him. He went to the court and was taken into custody. While out on bond, he and his wife got together a couple of times. On the night when he was arrested on the charges that resulted in acquittals (the July 9 incident Stamer described), appellant thought he was "just going home."

After his conviction in the present case, appellant was first at San Quentin and then at Solano State Prison for almost 10 years. His security level at Solano was three, whereas the typical level for a person beginning a life sentence would be four. He worked as a teacher's assistant and tutored prisoners getting their GEDs, then when

6

required to change jobs after two years, worked in the computer lab, helping with general education and tutoring. His work ratings were the highest it was possible to get.

Appellant testified that it was very easy to get alcohol at Solano and he could have been drinking if he had wanted to. He never did. He testified that alcohol had ruined his life and he was never going to drink again.

When he came to Solano, his number on the classification system was high—around 47 or 50—but for the last six or seven years it had been the lowest possible for an inmate serving a life sentence, which he believed was 19. His risk assessment number was also "the lowest."

Appellant requested to be moved to San Quentin because it was "a better place" with "less trouble." His security level was reduced to two. Alcohol and illegal substances were readily available but appellant had never partaken of either.

Eleven years before the resentencing hearing, appellant joined a Bible study group and ever since had read the Bible every day. Appellant testified that finding God and Jesus had changed his life and, more recently, his view of Alcoholics Anonymous (AA). Previously, he had had "trouble" with the steps because they were based on a "higher power" model, but he now felt the program fit him perfectly.

Appellant had a lower bunk for medical reasons, because he was unable to get to a top one. Getting to an activity such as a church service would be difficult for him because it required going up and down stairs, which was hard due to his mobility issues and his Chronic Obstructive Pulmonary Disease (COPD), which made it hard for him to breathe. Related to the COPD, he had had pneumonia requiring hospitalization outside the prison on two occasions; he had also been hospitalized for acute renal failure. He had Hepatitis C, for which treatment had failed, and cirrhosis of the liver. He also had coronary artery disease, with a 40 percent blockage in his arteries, and took medication for depression.

Appellant testified that having a beer "would be just like slicing my wrist . . . You know, it would kill me. It would kill me not just medically, but it would kill my soul as well. It just would ruin me. I have . . . cirrhosis. My platelets are . . . getting lower and

7

lower each time I have a test where I bruise easily. That's from just the cuffs I had on just yesterday. And if . . . they keep going down, eventually the doctor said I will just eventually bleed out if my liver gets any worse than it is. It hurts at times." If released, appellant planned to get involved in church and AA, and make sure he never has another drink by "setting up everything I can that's available to make . . . that happen, to make that work."

Appellant testified that if his resentencing request was granted and he was released from state prison, due to his federal parole hold, he would go into federal custody for between one and three years, followed by three months in a halfway house and then supervision by the federal probation department. Because he would have "drug and alcohol aftercare," he would have to call every day and would be required to come for drug testing two or three times a week and to participate in counseling. Once released from the halfway house, appellant planned to live with his sister and her husband, who had a spare room for him in their condominium. Appellant did not expect to be given methadone while in federal custody but expects some other form of pain medication; once released, he intended to get Medicare and appropriate medical care for all of his conditions.

Appellant acknowledged that when released from federal custody after the nine months he served for his parole violation, he understood he was not allowed to drink alcohol. His blood alcohol level was .31 on February 25, 1998, when he was arrested for drunk driving, and he was on federal probation and very drunk when he set fire to the cottage. He did not believe there were flammable liquids involved in the fire, and did not believe he told a police officer that he had warned his wife he was going to set the place on fire. He denied being taken to a mental institution on a Welfare and Institutions Code section 5150 hold after the fire, saying he was only taken to a regular hospital due to smoke inhalation. When he was arrested, he was "loaded" and had a screwdriver in his hand. He did not see or talk to his wife after the police pepper sprayed him, but told the police officer who hit him that they could not keep him in prison forever. Appellant testified that he was "very remorseful" about the time in his life when he committed his

8

crimes. He was "heavily into drugs and drinking" at the time, and drinking made him do things he would not normally do. He testified that it was physically hard for him to get to AA and NA (Narcotics Anonymous) meetings in prison and that he had gone, but not long enough to get a certificate.

Dr. John Cranshaw, who had been appellant's primary care physician at San Quentin for a number of years, had last seen him in the spring of 2013. He testified that appellant was "quite frail" and had multiple medical conditions, the most important being moderate to severe emphysema (a variant of COPD), hepatitis C with probable cirrhosis of the liver, severe degenerative changes in his spine and scoliosis for which he had had surgery. Appellant was able to get around: he could get in and out of a chair and ambulate at least 100 yards with a cane. He had chronic pain for which he was being treated with methadone, as other medications had not helped him. Appellant also had coronary artery disease, hypertension, pre-diabetes, and, recently, a vitamin B12 deficiency with probable related neurologic changes and more significant cervical spinal stenosis. He probably had restrictive lung disease since having had surgery to remove pockets of fibrosis and pus due to an infection around his lungs, a procedure that usually leads to the lungs being smaller and not expanding well. He was at risk for further such infections, another one of which could "easily" be life threatening. An attempted treatment for hepatitis C had failed and in the last year or so appellant had begun to develop laboratory abnormalities suggesting (but not proving) he had developed cirrhosis of the liver. A period of binge drinking would likely have significant physical consequences, and heavy enough drinking could easily result in liver failure and death. Cranshaw had seen no indication that appellant was drinking or abusing his medication.

Cranshaw testified that appellant's health had declined over time, in particular his lung and liver function. In custody, appellant wears a vest that alerts staff to his mobility issues and he had an aide to help him with mobility issues. If released, he would have difficulty with mobility, would not be able to travel more than short distances, would not be able to sit or stand for long periods of time and would not have a great deal of stamina. Outside of prison, methadone is administered through clinics or a pain management

9

specialist; Cranshaw expected that a pain management specialist would monitor appellant but give him limited amounts of medication to take at home on a regular basis. Due to his medical conditions, appellant does not have the life expectancy of a normal 65-year-old. In particular, lung disease invariably gets worse over time.[6]

Appellant submitted evidence documenting that during 14 years in prison, the only negative entries in his record concerned minor infractions—smoking a cigarette on one occasion in 2000, having an unauthorized beard on three occasions in 2002 and 2003, and failing to report to medication line on two occasions in 2005. A 1994 report indicated that in federal custody since 1988 appellant had met most of the goals set upon his initial classification, including a 28-week drug education course and numerous educational programs; he had "continuously" received "excellent to outstanding work reports"; and his only incident report was for possession/use of intoxicants in 1993, the disposition of which was "7 Days No Commissary." While in federal custody, he earned 64 college credits, with a 3.906 cumulative grade point average. Appellant's grades on miscellaneous CDC work supervisors' reports from 2000 to 2007 ranged from "satisfactory" to "exceptional."

Appellant's score on the California Static Risk Assessment administered by the Department of Corrections and Rehabilitation was 1, meaning "low." Psychologist Douglas Korpi, who was retained to perform a risk evaluation for appellant, noted in his report that appellant had been "extensively treated for a number of medical problems,

---

[6] Consistent with Cranshaw's testimony, the "problem list" in appellant's prison medical records included "advanced chronic obstructive pulmonary disease with history of multiple exacerbations"; "mobility impaired, designated as a permanent Disability Not Impacting Institutional Placement"; hypertension; hyperlipidemia; "hepatitis C genotype 1b, failed treatment 2005"; "chronic low back pain with severe scoliosis status post Harrington rod placement, on methadone for chronic pain"; impaired fasting glucose; coronary artery disease with history of catheterization November 2011"; "history of acute renal failure, resolved"; "mental health issues, followed by psychiatry, correctional clinical care management system (CCMS)"; and "history of pneumonia 2011 with empyema status post thoracotomy and decortication." As of April 2009, appellant was identified as "mobility impaired (D-DNM), requiring a cane, lower bunk and no stairs."

these including [COPD], hypertension, hepatitis C, coronary artery disease, and scoliosis." With respect to the scoliosis, he had been prescribed methadone due to the problem with the rod in his spine. He had also been receiving medication for depression. Korpi noted that appellant was "a dangerous man" in his thirties and forties, but that "[a]t issue is the defendant's dangerousness now, a quarter of a century since his last conviction for violence." At 64 years of age, appellant was "not the risk he once was, but neither [was] he 90 and incapacitated." Korpi stated that "Department of Justice figures make clear that individuals over the age of 60 are many times less likely to violently act out than men in their 30's and 40's. At age 60 and above, approximately 3% of men violently recidivate (by contrast, 5 years recidivism rates for men in their 30's cluster about 25%.)"

Korpi discussed five "changing, dynamic, and current psychological and sociological factors" that bear on predicting future risk. "First, we want to look at an individual's responsivity to treatment in pro-social activities. In this regard, the defendant's current Central File is rife with better-than-average work reports, notices of substance abuse treatment completion, and general treatment compliance all-round. Likewise, the defendant no longer gives evidence of an impulsive lifestyle: his last Rules Violation was back in 2003, and even then the violation was exceptionally minor (grooming). The defendant does not give ongoing evidence of depression, affective instability, or agitation. Fourth, the defendant no longer harbors the resentments of what it means to be antisocial, he is not prone to blaming, and he does not feel himself to be a victim. And lastly, the defendant seems to have some insight into the nature of his antisocial and drinking ways, acknowledging the damage he has done others and himself, allowing himself to understand the degree to which alcoholism has ruined his life and quick to assign blame to no one else other than himself." Korpi felt appellant's plans for release—living with his sister and her husband in Arizona—were reasonable. Korpi stated that he "would not go so far as to conclude that the defendant was at no risk to violently offend, but I would conclude just as has CDCR in their California Static Risk Assessment: the defendant's risk to violently act out in the future is Low."

11

In an addendum, Korpi assessed appellant's risk of alcohol relapse as "low-moderate." By history alone, appellant's risk of relapse would be "very significant," but Korpi identified a number of positive "present and clinical or psychological factors": Appellant did not appear to be "angry, bitter and blaming," he was cooperative in dealing with medical and psychiatric staff, he had adequate insight into the nature of his alcoholism, he had sought out psychological treatment as needed, he acknowledged that, for him, alcohol use was life-threatening, he had a history of being responsive to treatment and intervention, his plans for the future were sound. Korpi concluded, "His historical risk is so very high that he will always be at some risk to resume drinking, but the clinical markers in this case are exceptionally good, and his risk-management factors and medical needs are, by and large, protective."

Richard Subia, who had retired after 27 years with the Department of Corrections (Department) in positions from correctional officer to prison warden to Director of Division of Adult Institutions, responsible for oversight of all adult institutions in the state, testified as an expert on Department operations. He had about 11 years of personal experience with risk assessment, including chairing committees on inmate risk assessment and establishing risk assessment tools.

Subia testified that alcohol and controlled substances are as available in prison as outside, although the cost is higher. Appellant's prison records did not reflect any alcohol or substance abuse violations. He was identified as mobility impaired, as a result of which his housing and program was adjusted, he was required to wear a yellow vest to prevent staff from taking aggressive action if he did not comply with instructions, and he was assigned an aide to assist with tasks such as carrying his tray in the dining hall. After reviewing appellant's records and interviewing him, Subia concluded appellant would not pose an unreasonable risk to public safety if released. This conclusion was based on appellant's ability to refrain from using drugs and alcohol, the absence of serious or violent offenses in his prison record, the documentation of his helping other inmates through activities such as tutoring, and the fact that inmates of appellant's age have a lower propensity to violate once released, especially in his condition. He did not view

12

appellant's treatment with methadone and medication for his depression as a substitute for alcohol because, unlike many inmates who would hoard prescribed medication or use it in addition to alcohol or other controlled substances, there was no indication appellant had done anything but follow his doctors' directions. Subia noted that appellant took it upon himself to do the work of the AA program despite being unable to directly participate: NA/AA programs at San Quentin were held in the lower yard, some 50 to 75 steps down, and appellant found it too difficult to go down and back up, while at Solano, rehabilitative programs were only offered to inmates in the last 36 months of their terms.

Cheryl Simone, a former federal probation officer, testified that there was a federal detainer lodged against appellant for a pending parole violation. If released from state custody, he would be remanded to federal authorities and transferred to a local federal institution. Within 90 days, he would be brought to Oklahoma City for a hearing before the United States Parole Commission. Assuming the alleged parole violation was based on the offenses for which appellant was convicted in California, he would be found in violation of his federal parole and the parole board would determine his penalty. Appellant had four years remaining of his original 12-year federal sentence. He would be given credit for his years in state custody against the pending parole violation, but this would not necessarily mean he would be released immediately. Appellant first would have to propose a release plan in coordination with a case manager at the Bureau of Prisons, which would be sent to the proposed release district, in this case Arizona. Simone had interviewed appellant's sister, who said that she and her husband were eager to have appellant live with them. They maintained a clean and sober living environment and were prepared to work cooperatively with the probation officer. The release protocol would often call for a transitional period in a halfway house. Simone expected that the treatment plan for appellant would include electronic alcohol monitoring, which was one of the many resources available in Arizona. Having been a probation officer from 1990 until 2012, Simone testified that supervision standards had increased and drug and alcohol resources were very strong.

Evette Feigel, appellant's niece, testified to her life-long warm relationship with appellant and his effort to maintain it through letters throughout his incarceration, as well as to develop and maintain a relationship with her daughter, who was born while appellant was in custody. Appellant also submitted documentation of the support he would receive upon his release. Appellant's sister wrote that appellant would be living with her and her husband in Arizona, with his own room and bathroom in their condominium in a gated community. Another sister wrote to the court attesting to the family's love and support, as did three nieces. The husband of the mother of appellant's son offered emotional support, living space and employment at his family medical practice in New York. The director of Share Group Inc., where appellant worked as a fundraiser from August 1996 until February 1998, commended his commitment, reliability and attitude and stated she would re-hire him "in a heartbeat."

In response to the court's inquiry whether there had been any contact between appellant and his ex-wife Carol after the threat on the night of the fire, the defense submitted letters appellant wrote to her after his arrest. The court agreed that these were conciliatory, not threatening, and that there was no evidence of other contact.

## DISCUSSION

Prior to the adoption of Proposition 36, the Three Strikes Reform Act of 2012 (Reform Act), a defendant who had previously been convicted of two or more serious or violent felonies was subject to an indeterminate sentence of 25 years to life upon conviction of any new felony. (*People v. Chubbuck* (2014) 231 Cal.App.4th 737, 740 (*Chubbuck*); *People v. White* (2014) 223 Cal.App.4th 512, 517 (*White*); *People v. Kaulick* (2013) 215 Cal.App.4th 1279, 1285 (*Kaulick*).) "The Reform Act prospectively changed the Three Strikes law by reserving indeterminate life sentences for cases where the new offense is also a *serious or violent felony,* unless the prosecution pleads and proves an enumerated disqualifying factor. In all other cases, a recidivist defendant will be sentenced as a second strike offender, rather than a third strike offender." (*Chubbuck,* at pp. 740-741; *Kaulick,* at p. 1286; *People v. Yearwood* (2013) 213 Cal.App.4th 161, 167-168 (*Yearwood*).)

14

"The Reform Act also created a ' "post-conviction release proceeding" ' whereby a Three Strikes prisoner who is serving an 'indeterminate life sentence' for a crime that was not a serious or violent felony—and who is not otherwise disqualified—may have his or her sentence recalled and be resentenced as a second strike offender, unless the court 'determines that resentencing . . . would pose an unreasonable risk of danger to public safety.' (§ 1170.126, subds. (a), (f), (m); see *Yearwood, supra,* 213 Cal.App.4th at p. 168.)" (*Chubbuck, supra,* 231 Cal.App.4th at p. 741; *White, supra,* 223 Cal.App.4th at p. 517.) In determining whether the petitioner would pose an unreasonable risk of danger to public safety, "the court may consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

## I.

We consider first appellant's argument that "unreasonable risk of danger to public safety" as used in subdivision (g) of section 1170.126 must be viewed as having the definition that was expressly provided for the same phrase in the subsequently enacted section 1170.18, subdivision (c).[7] This latter statute was enacted by Proposition 47, the Safe Neighborhoods and Schools Act, on November 4, 2014 (effective Nov. 5, 2014), two years after the enactment of section 1170.126 and a year after the trial court denied appellant's petition for resentencing. Section 1170.18, subdivision (c), provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning

---

[7] This argument was raised in appellant's reply brief. Proposition 47 was enacted after appellant's opening brief was filed. His argument based on Proposition 47 is essentially a modification of the argument in his opening brief addressing the determination of dangerousness under section 1170.126, subdivision (g).

of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."
The cited clause enumerates eight particularly egregious felonies, sometimes referred to
as "super strikes."[8] (*People v. Johnson* (2015) 61 Cal.4th 674, 682.)

Proposition 47 requires misdemeanor sentences for certain drug and theft related
offenses that had been felonies or wobblers, unless the defendant has a prior conviction
for one of the super strikes. (Health & Saf. Code, §§ 11350, subd. (a), 11357, subd. (a),
11377, subd. (a); §§ 459.5, subd. (a), 473, subd. (b), 476a, subd. (b), 490.2, subd. (a),
496, subd. (a), 666, subd. (b), 1170.18, subd. (a).) It also enacted a new statutory
provision permitting a person serving a felony sentence for a reclassified offense to
petition for a recall of his or her sentence. (§ 1170.18, subd. (a).) Like section 1170.126,
section 1170.18 requires the trial court to determine whether "resentencing the petitioner
would pose an unreasonable risk of danger to public safety" before imposing a

---

[8] The felonies described in clause (iv) of section 667, subdivision (e)(2)(C), are as follows:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

"(V) Solicitation to commit murder as defined in Section 653f.

"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

misdemeanor sentence, and in making this determination the court is authorized to consider the same factors as specified for courts considering whether to resentence a petitioner under the Reform Act.  (§§ 1170.18, subd. (b), 1170.126, subd. (g).)[9]  Because section 1170.18, subdivision (c), provides that its definition of " 'unreasonable risk of danger to public safety' " applies "throughout this Code," appellant maintains he can be found to pose such danger only if there is evidence he poses an unreasonable risk of committing one of the felonies referenced in section 1170.18, subdivision (c).

The question whether the definition of "unreasonable risk of danger to public safety" stated in Proposition 47 applies to resentencing under Proposition 36 is currently pending before the California Supreme Court, which has granted review in a number of cases that rejected the argument appellant makes here.[10]  In appellant's view, section 1170.18, subdivision (c), is straightforward and unambiguous:  The restrictive definition it provides applies "throughout this Code"—the Penal Code—and therefore necessarily applies to section 1170.126, subdivision (f), the only other provision in the Penal Code that uses the phrase "unreasonable risk of danger to public safety."  And because sections 1170.18 and 1170.126 set forth retrospective, remedial procedures to reduce previously

---

[9] These factors are "[t]he petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes"; "[t]he petitioner's disciplinary record and record of rehabilitation while incarcerated"; and "[a]ny other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety."  (§§ 1170.18, subd. (b), 1170.126, subd. (g).)

[10] These cases include *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted February 18, 2015, S223825; *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676; *People v. Payne* (2014) 232 Cal.App.4th 579, review granted March 25, 2015, S223856; *People v. Crockett* (2015) 234 Cal.App.4th 642, review granted May 13, 2015, S225198; *People v. Davis* (2015) 234 Cal.App.4th 1001, review granted June 10, 2015, S225603.

imposed sentences that have since been deemed disproportionate, appellant maintains the new definition created in Proposition 47 must be applied retroactively to his case.[11]

" ' "When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." [Citation.]' [Citation.]" (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) But "[t]he literal language of a statute does not prevail if it conflicts with the lawmakers' intent[.] [Citations.]" (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1033–1034.) In determining that intent, we consider extrinsic aids such as " 'the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]' (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008.) We also ' "refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' (*People v. Rizo* [(2000)] 22 Cal.4th. [681,] 685.)" (*Osuna, supra*, at p. 1034.) We consider "the consequences that will flow from a particular interpretation" (*Dyna–Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387), as well as "the wider historical circumstances" of the statute's or statutes' enactment (*ibid.*). " 'Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' (*People v. Sinohui* (2002) 28 Cal.4th 205, 212.)" (*Osuna*, at pp. 1034–1035.)

---

[11] Appellant asks us to take judicial notice of the text of Proposition 47 and ballot materials, and we do so. Appellant also asks us to judicially notice information posted on the website of a group opposing Proposition 47 and a memorandum by the California District Attorneys Association evaluating the proposition, and another such memorandum by the Judicial Council of California, as well as various documents concerning the implementation of Proposition 47. We deny this portion of the request for judicial notice as we do not find the documents at issue relevant to our resolution of this appeal. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

18

While Propositions 36 and 47 both lessened punishment for certain offenders, their subject matter was not the same. The three strikes law, of course, addresses recidivism and, in particular, recidivism involving serious or violent felonies. "The purpose of the three strikes law has been variously stated as being ' "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses" ' (*In re Young* (2004) 32 Cal.4th 900, 909) and 'to promote the state's compelling interest in the protection of public safety and in punishing recidivism' (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1070). Although the [Reform] Act 'diluted' the three strikes law somewhat (*People v. Yearwood, supra,* 213 Cal.App.4th at p. 167), '[e]nhancing public safety was a key purpose of the [Reform] Act' (*id.* at p. 175)." (*Osuna, supra,* 225 Cal.App.4th at pp. 1035-1036.) Thus, the proposed law declared, "The People enact the Three Strikes Reform Act of 2012 to restore the original intent of California's Three Strikes law—imposing life sentences for *dangerous criminals* like rapists, murderers, and child molesters." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of proposed law, § 1, p. 105, italics added.) The findings and declarations focused mainly on safety, including statements that the proposed law would require that "murderers, rapists, and child molesters . . . receive life sentences, even if they are convicted of a new minor third strike crime" and "[p]revent the early release of dangerous criminals who are currently being released early because jails and prisons are overcrowded with *low-risk, non-violent inmates* serving life sentences for *petty crimes.*" (*Ibid.*)[12]

---

[12] The other findings and declarations stated that the proposed law would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime"; "[m]aintain that repeat offenders convicted of *non-violent, non-serious crimes like shoplifting and simple drug possession* will receive twice the normal sentence instead of a life sentence"; and "[s]ave hundreds of millions of taxpayer dollars every year for at least 10 years" since the state would "no longer pay for housing or long-term health care for elderly, *low-risk, non-violent inmates* serving life sentences for *minor crimes.*" (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of proposed law, § 1, p. 105, italics added.)

Proposition 47 addressed specific less serious offenses and cost savings to be achieved by reclassifying these offenses as misdemeanors. The findings and declarations state that the measure was enacted "to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs in K–12 schools, victim services, and mental health and drug treatment. This act ensures that sentences for people convicted of dangerous crimes like rape, murder, and child molestation are not changed." (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of proposed law, § 2, p. 70.)

Nothing in the official ballot pamphlet for Proposition 47 suggests it would have any impact on the procedure for resentencing three strike inmates. The legislative analysis provided in the ballot pamphlet states that Proposition 47 was intended to reduce penalties "for certain nonserious and nonviolent property and drug offenses from wobblers or felonies to misdemeanors." (Voter Information Guide, Gen. Elect. (Nov. 4, 2014) analysis by the Legislative Analyst, p. 35.) Those crimes were identified as "Grand Theft," "Shoplifting," "Receiving Stolen Property," "Writing Bad Checks," "Check Forgery," and "Drug Possession." (*Id.* at pp. 35–36.) The proponents of Proposition 47 argued the measure "is sensible" in that it "[s]tops wasting prison space on petty crimes and focuses law enforcement resources on violent and serious crime by changing low-level, nonviolent crimes such as simple drug possession and petty theft from felonies to misdemeanors." (*Id.* at p. 38, argument in favor of Prop. 47.) With respect to resentencing, the Legislative Analyst explained that the measure would allow "offenders currently serving felony sentences *for the above crimes* to apply to have their felony sentences reduced to misdemeanor sentences," but that "no offender who has committed a specified severe crime could be resentenced or have their conviction changed" and that a court "is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender will commit a specified severe crime." (*Id.* at p. 36, italics added.)

20

The absence of any mention of three strikes resentencing in the materials concerning Proposition 47 is particularly striking because the measure was put before the voters only two years after Proposition 36 and clearly modeled its resentencing provisions on those of Proposition 36. As just noted, the legislative analyst stated that "no offender who has committed a specified severe crime could be resentenced or have their conviction changed" and that a court "is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender will commit a specified severe crime" (*id.* at p. 36) but gave no hint that Proposition 47 would affect sentencing for anything other than the new misdemeanors—certainly not sentencing of three strikes offenders whose current crimes—even if eligible for resentencing under Proposition 36—remain felonies.

The "throughout this Code" language that appellant relies upon appears only in the text of the proposed law—which comprises almost five full pages of the ballot pamphlet and consists of densely worded text creating the new "Safe Neighborhoods and Schools Fund," adding and amending the statutes describing the affected offenses and, finally, creating the resentencing procedures. The ballot analysis did not mention this language, nor did it suggest the restrictive definition of dangerousness set forth in section 1170.18, subdivision (c), would apply to anything other than resentencing for the specific offenses addressed in Proposition 47.

Proposition 36, as we have said, diluted the severity of the three strikes law but retained a strong emphasis on public safety in its provisions for sentencing recidivist offenders with histories involving multiple serious or violent felonies. In allowing for more lenient treatment of recidivist offenders whose "third strike" offenses were of a less serious nature, section 1170.126 allowed courts broad discretion to determine whether resentencing would pose an "unreasonable risk to public safety." There is absolutely no basis for inferring that the voters who adopted Proposition 47—a measure dealing entirely with nonserious offenses and misdemeanor sentencing—intended not only to change three strikes resentencing but to do so by drastically limiting courts' discretion to avoid resentencing three strikes offenders.

21

## II.

As explained above, under section 1170.126, subdivision (f), a three strikes inmate whose sentence was imposed for an offense that was not a serious or violent felony and who is not disqualified by one of the enumerated factors may be resentenced as a second strike offender unless found to present an unreasonable risk of danger to public safety. A defendant with two or more prior strike convictions who is sentenced after passage of the Reform Act for an offense that is not a serious or violent felony and who is not otherwise disqualified is entitled to be sentenced as a second strike offender without consideration of dangerousness. Appellant contends that this difference in treatment violates the constitutional guarantee of equal protection of the law.

We disagree. " 'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, " '[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' " [Citation.] "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " [Citation.]' (*People v. Brown* (2012) 54 Cal.4th 314, 328; accord, *People v. Wutzke* (2002) 28 Cal.4th 923, 943.)" (*People v. Losa* (2014) 232 Cal.App.4th 789, 792-793.) Appellant is not similarly situated to persons being newly sentenced for current offenses under the amended three strikes law. (*Id.* at p. 793.) "Defendant is not merely entering the prison system; rather, he has been confined there for a substantial period of time[,]" having been properly convicted of a third felony after having committed two prior serious or violent felonies. (*Ibid.*)

In rejecting the claim that prospective-only application of the Reform Act violated equal protection, *Yearwood*, *supra*, 213 Cal.App.4th 161 explained: "In [*People v. Floyd* (2003) 31 Cal.4th 179 (*Floyd*)] our Supreme Court rejected the defendant's claim that denying him the benefits of an ameliorative statute creating an alternative drug offender sentencing scheme violated his equal protection rights by creating two classes of

22

nonviolent drug offenders based on the date of conviction. The court reasoned: 'Defendant has not cited a single case, in this state or any other, that recognizes an equal protection violation arising from the timing of the effective date of a statute lessening the punishment for a particular offense. Numerous courts, however, have rejected such a claim—including this court.' (*Id.* at p. 188.) ' "[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time." [Citation.]' (*Id.* at p. 191.)" (*Yearwood*, at p. 178.)[13]

"The rational relationship test has been deemed appropriate to equal protection challenge such as this one. (*Floyd, supra,* 31 Cal.4th at p. 191; *People v. Cruz* [(2012)] 207 Cal.App.4th [664,] 678–680.) Prisoners are not a suspect class. The status of being incarcerated is neither an immutable characteristic nor an invidious basis of classification. ([*Cruz*,] at p. 676, fn. 11.) Prospective application of amended sections 667 and 1170.12 furthers legitimate interests and does not unfairly discriminate against appellant. A prisoner who was sentenced to an indeterminate life term before the Act's effective date may file a section 1170.126 petition upon finality of the judgment. If qualified, the prisoner will ordinarily receive the same sentencing reduction that would have been obtained if he or she had been resentenced under amended sections 667 and 1170.12. The discretionary public safety exception to second strike sentencing that is present in section 1170.126, but not in amended sections 667 and 1170.12, is rationally related to a

---

[13] *Yearwood* explained that the general rule presuming that legislation mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments (*In re Estrada* (1965) 63 Cal.2d 740) "is not 'constitutionally compelled' and does not require a contrary result." (*Yearwood, supra,* 213 Cal.App.4th at p. 178.) " 'Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*People v. Brown*[, *supra*,] 54 Cal.4th [at p.] 324.)" (*Yearwood*, at pp. 173-174.) "The *Estrada* decision 'recognized that when the Legislature has amended a statute to lessen the punishment, its determination as to which statute should apply to all convictions not yet final, "*either way,* would have been legal and constitutional." ' " (*Id.* at p. 178, quoting *Floyd*, *supra*, 31 Cal.4th at pp. 188-189.)

legitimate state interest. It increases the likelihood that prisoners whose sentences are reduced or who are released due to the Act will not pose an unreasonable risk of danger to the public. Thus, the distinction drawn between felony offenders sentenced before, and those offenders who are sentenced after the Act's effective date, does not violate appellant's state or federal equal protection rights. (*Floyd*, . . . at pp. 188–191; see also [*Cruz*], at pp. 674–680.)" (*Yearwood*, *supra*, 213 Cal.App.4th at p. 178.)

The critical difference between initial sentencing under the Reform Act and resentencing under section 1170.126, of course, is the dangerousness inquiry appellant challenges here; retroactive application of the Reform Act would obviate the need for resentencing in cases not yet final, ensuring a second strike sentence for a previously sentenced inmate who would receive a second strike sentence after the Reform Act. With respect to the dangerousness issue, *Yearwood* explained further: "Giving amended sections 667 and 1170.12 prospective-only application supports the Act's public safety purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison due to the Act. During the pretrial, trial and sentencing phases of the criminal justice system, various discretionary decisions are available to the prosecutor and the trial court that can result in a shorter or longer term of imprisonment (e.g., selection of the appropriate base term, concurrent or consecutive sentencing, dismissal of a strike in the interests of justice). Once the defendant is sentenced, prosecutorial and judicial discretion are effectively exhausted. Amended sections 667 and 1170.12 do not provide the trial court with any discretion to impose a third strike sentence based on a finding of current dangerousness. In contrast, section 1170.126 entrusts the trial court with discretion that may be exercised to protect the public. A court may deny a section 1170.126 petition if, after examination of the prisoner's criminal history, disciplinary record while incarcerated, and any other relevant evidence, it determines that the prisoner poses 'an unreasonable risk of danger to public safety.' (§ 1170.126, subd. (f).)

"If amended sections 667 and 1170.12 are given retroactive application, prisoners in appellant's procedural posture would be entitled to automatic resentencing as second strike offenders without any judicial review to ensure they do not currently pose an

24

unreasonable risk of danger to public safety. The time period between sentencing and finality of the judgment can span years. Prisoners can substantially increase in dangerousness during this interval. An increase in dangerousness will not always be reflected in new criminal convictions. Also, prisoners could have been dangerous when the life sentences were imposed and remained unreasonable safety risks. It would be inconsistent with the public safety purpose of the Act to create a loophole whereby prisoners who were sentenced years before the Act's effective date are now entitled to automatic sentencing reduction even if they are currently dangerous and pose an unreasonable public safety risk." (*Yearwood,* 213 Cal.App.4th at p. 176.)

*People v. Losa*, *supra*, 232 Cal.App.4th at page 793, also denied an equal protection challenge to the section 1170.126 resentencing procedures. The court explained that the defendant was not similarly situated to defendants being newly sentenced under the Reform Act. " '[Defendant] *was properly sentenced* to prison for an indefinite term because he was *properly convicted* (beyond a reasonable doubt, by a unanimous jury) of a third felony after he had committed two prior serious or violent felonies. It was his third felony conviction which, pursuant to the law in effect at the time, subjected him to an indeterminate sentence. Now, due to the adoption of the Act, [defendant] may be entitled to a downward modification of this indeterminate term to a determinate second strike sentence. That he may be denied such downward modification due to a finding of dangerousness based on a preponderance of the evidence does not mean that he would be subjected to indefinite confinement based on this finding. He is subject to the indeterminate term due to his original third strike sentence; the dangerousness finding would simply deny him a downward modification. This process does not deny [defendant] his constitutional right to equal protection of the law.' (*Kaulick, supra,* at p. 1306, fn. omitted.)" (*Losa,* at p. 793.)

We agree. Appellant's equal protection challenge is without merit.

### III.

In support of his petition for resentencing, defense counsel argued that appellant was exactly the sort of person for whom resentencing was contemplated by the Reform

25

Act:  His prior serious or violent felonies occurred in a short period of time almost 30 years earlier, when he had been on a substance abuse and/or alcohol binge, and the commitment offense also occurred when he was grossly intoxicated and was an attempt to get his wife's attention; for almost 15 years in prison, he did not take advantage of readily available alcohol or drugs; his medical condition made it very unlikely he would commit a serious or violent offense; and, if released, he would not go straight to the street but rather would be under federal supervision.

The prosecutor, on the other hand, argued that despite appellant's age and frailty, "a can of lighter fluid and a match, Judge, that's all it would take."  The prosecutor emphasized that appellant had threatened to set the fire before he did so; that police officers suffered from smoke inhalation; that appellant's blood alcohol level was .27 on the night of the fire and .31 a month before, when he was in a drunk driving accident; and that all the victims of his crimes were women—the bank teller, the store clerk, the girlfriend and the ex-wife.  The prosecutor argued that appellant did not need to use alcohol or other substances in prison because he was taking his prescribed methadone, and that he behaved in prison because it was a controlled environment, he was being medicated and there were no vulnerable women.  The prosecutor voiced distrust of the federal parole system, noting appellant's intoxication only months after being released on federal parole in 1994.

The trial court denied the petition for resentencing, acknowledging that in general a person is less dangerous as he or she ages and to the extent he or she has a deteriorating physical condition, but nevertheless finding that releasing appellant would pose an unreasonable risk to public safety.  The court expressly disagreed with Subia's assessment that appellant would not pose an unreasonable risk, stating that it questioned Subia's conclusions "in light of the factors that he didn't know about [appellant] and the fact that they had no effect on his opinions."  The court was "not reassured" by the fact that appellant would be under federal parole supervision because he had previously violated federal parole by drinking heavily.  Accepting that appellant's prior offenses were committed "a long time ago," the court noted their seriousness, then stated that "it's

26

not just youthful criminality," as appellant set fire to the cottage, threatened his wife and "went at arresting officers" with a screwdriver when he was nearly 50 years old. The court referred to appellant's last wife describing appellant threatening to kill her and trying to kill her pets in order to torment her, apparently a reference to events related to the other charges against appellant in 1998. Rejecting defense counsel's characterization of appellant as a "poster child" for resentencing, the court quoted at length the comments of the judge who, at sentencing in 1999, emphasized the severity of appellant's substance abuse problem and failure to deal with it and as the seriousness of the priors, as well as this court's description of appellant as "extremely dangerous to the public" in our opinion affirming the three strikes sentence. Stating that appellant was "a man who with very little at his disposal can threaten, and does threaten, and follows through with those threats," and agreeing with the prosecutor's observation that all it would take for appellant to repeat his crime is "lighter fluid and a match," the court concluded that appellant posed an unreasonable risk of danger to public safety "notwithstanding his age and his physical condition."[14]

---

[14] The court's full explanation was as follows:

"These are all difficult cases. They are difficult particularly when you have an inmate who is older, as the defendant is, who has physical limitations, as the defendant does. I don't think it's an unreasonable general rule to say that a person is less dangerous as they age and less dangerous to the extent that they have a deteriorating physical condition.

"However, I do believe in Mr. Valentine's case that releasing him would pose an unreasonable risk of danger to public safety. [¶] I disagree with Mr. Subia. And I question his conclusions in light of the factors that he didn't know about Valentine and the fact that they had no effect on his opinions.

"I'm not reassured by the fact of federal parole supervision. He had federal parole supervision previously. And I recognize that we can say, well, it's different now than it was. It remains a fact that it did nothing to assist the public with regard to Valentine.

"In his much younger years, he committed robberies. It's true that was a long time ago. One was a robbery of a woman in a toy store at gunpoint, or a threat of a gun, or threat of a bomb. And one was a bank robbery threatened use of weapons again. A female teller there.

"But it's not just threats with Valentine. He is responsible for the death of a girlfriend who was found dead shot in the chest. It was the defendant's gun. He says he went—it went off by accident.

"And it's not just youthful criminality that we are talking about with Valentine. He not only threatened but actually set fire to the cottage where he and his wife were living because he was angry at his wife. He also threatened his wife at the time of his arrest. He also went at arresting officers with a weapon, a screwdriver, even when ordered to drop it. And this was all when he was nearly 50 years old.

"And then there is the statement of the person who knows him best, the victim of that arson, his last wife, and her statements are chilling. The threats to kill, the explicit threat when holding a concrete block threatening to kill her telling her, you always knew it would come to this that I would kill you, today is the day.

"On the day of the arrest, he tells her, Carol, I will get out of jail some day.

"And is asked, is that a threat?

"Yes, it is.

"And the statements of Carol Karwatt with regard to the things that he did, not as a young man, this was his fourth wife, multiple attempts to kill her pets, trying to get them to cross El Camino Real so that they would be killed. All in an effort to torment his fourth wife.

"You say, [defense counsel], this is the poster child. This is not the poster child. I have seen cases that have come across my desk in post-Prop 36 where there are poster children for three strikes re-sentencing. This is not him.

"What was said by the Court of Appeal with reference to this man having read his record where he challenged the three strikes sentence, this was after his offense committed at the age of 50, "Appellant is a recidivist offender who is extremely, not unreasonably, extremely dangerous to the public.

"And the trial judge, the trial judge said in denying his motion to strike the prior convictions, 'This was not a shoplift, this was not a 666,' the trial judge said, 'to say you have a substance abuse problem is to put it mildly. You have one of the worst ones that I've ever come across.' Shortly before this incident led to your arrest, you had been arrested for a drunk driving charge with a blood alcohol I believe of .31 where you rammed into a car on the roadway. You then backed up into another car. You then backed up in order to get away. And I think you ultimately smashed into four cars. Apparently, according to the people involved, you express no deep remorse just basically admitted you did the offense.

"You've had numerous opportunities to deal with your substance abuse problem which goes back to I believe the mid-sixties, as Valentine was candid enough to admit.

28

Appellant argues that the trial court improperly relied upon immutable facts in his past record with no evidence of a rational nexus to *current* dangerousness. He draws an analogy to the context of inmates sentenced to indeterminate life term sentences being considered for parole after completion of their minimum terms. Under section 3041, subdivision (b), "a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' " (*In re Lawrence* (2008) 44 Cal.4th 1181, 1202, quoting § 3041, subd. (b), emphasis in *Lawrence*.)

In the parole context, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole." (*In re Lawrence, supra,* 44

---

You have been all over the United States violating the laws of various states. Las Vegas, Nevada, Florida, Chicago, New Orleans, now the State of California.

"The fact that you were trying to, you thought from your letters, the best time of your life was when you were with your wife. You had your yard. You had a job. And yet you continued to fall off the wagon. You keep drinking alcohol, using drugs. You are a danger to the community. You have been previously convicted of manslaughter with a weapon where apparently substance abuse occurred. You've committed a bank robbery where you threatened and scared the devil I'm sure out of your teller in that case. You committed a robbery of a small store which I believe sold various small items. You were to buy beer. You scared the heck out of the two people there at the shop making serious threats with a weapon. Expression of using a weapon on them.

"You fit within the spirit of the three strikes law frankly. You are a classic case. I don't see any reason why I would exercise my discretion in striking the strikes in this matter which were found to be true, three of them plus I believe a prison prior.' "

"He is not the poster child for three strikes relief. He is instead a man who with very little at his disposal can threaten, and does threaten, and follows through with those threats. I don't disagree with the prosecution in terms of lighter fluid and a match. I consider Valentine notwithstanding his age and his physical condition to be an unreasonable risk of danger to public safety.

"And on that basis, I'm going to deny his motion for re-sentencing."

29

Cal.4th at p. 1210.) The seriousness of the inmate's offenses does not alone constitute evidence of "*current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.)

As we explained in *In re Stoneroad* (2013) 215 Cal.App.4th 596, 621 (*Stoneroad*), "the commitment offense is an immutable factor that would almost always mandate upholding the denial of parole. Furthermore, after a period of time the commitment offense loses much of its usefulness in predicting the likelihood of future offenses. [Citation.] 'At some point,' *Lawrence* reasons, 'when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness.' [Citation.) The result of *Lawrence* and its progeny is that the aggravating nature of a crime can no longer provide evidence of current dangerousness 'unless there is also evidence that there is something about the commitment offense which suggests the inmate still presents a threat to public safety.' (*In re Denham* (2012) 211 Cal.App.4th 702, 715, citing *Lawrence,* at p. 1214.)" (*Stoneroad*, at p. 621.) "[T]he Board may not base a parole denial upon the circumstances of the offense, or other immutable facts, unless those facts support the ultimate conclusion that the inmate continues to pose an unreasonable risk of safety if released on parole." (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1459.)

Respondent does not dispute that the trial court was required to determine appellant's *current* dangerousness. According to respondent, however, the court did consider the factors appellant relies upon to claim he does not pose an unreasonable risk of danger to the public, and did not abuse its discretion in determining that appellant's

30

past conduct was a more significant indication of his present dangerousness than his medical condition and compliant behavior in prison.

"Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125, quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316.) But " ' "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]" ' (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355, citing to 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 244.) The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. (See *Hurtado* [*v. Statewide Home Loan Co.* (1985)] 167 Cal.App.3d [1019,] 1022.)" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298.)

Here, the court did specifically mention appellant's age and infirmity as factors that would normally weigh against a finding of dangerousness, finding that he posed an unreasonable risk of danger "notwithstanding his age and his physical condition." The court did not refer to any other postoffense factor, such as appellant's positive work reports, the absence of significant violations of prison rules in his records or his refraining from substance abuse during the 14 years of his state confinement. By describing appellant's past offenses and threats, and quoting the remarks of the trial judge who sentenced him in 1999 and this court, in affirming that judgment, the trial court here made clear that it found appellant's conduct and substance abuse issues 15 and 25 years before more dispositive of his current dangerousness than his age and physical infirmity. But it did not explain *why* it reached this conclusion, and its remarks gave no indication it

31

even considered appellant's conduct in the years since his last conviction. The court's view that appellant is "a man who with very little at his disposal can threaten, and does threaten, and follows through with those threats" was stated in the present tense, but the only explanation of this view was the description of conduct 15 to 25 years in the past.

The closest the trial court came to explaining its dismissal of appellant's physical frailty as a factor weighing against finding him unreasonably dangerous was its statement that "it did not disagree" with the prosecutor's comment that "a can of lighter fluid and a match" is "all it would take." The obvious point is that appellant's burning of the cottage did not require any significant effort or mobility. The court made no effort, however, to explain why appellant posed an unreasonable danger of repeating such conduct 15 years later. Similarly, taking the court's reference to appellant's conduct at age 50 as its explanation for rejecting his advancing age as a factor mitigating his dangerousness, the court made no effort to explain its conclusion that nothing would have changed with the passage of an additional 15 years. The court obviously believed that appellant would relapse into alcohol abuse if released, but offered no evaluation of the impact of appellant's 14 years of abstinence; the only apparent explanation for its belief was its statement that it was not reassured by the fact appellant would be supervised by federal probation officers because he had returned to drinking while on federal parole in 1995.

The essence of the trial court's determination on dangerousness appears to have been that appellant committed dangerous offenses and threatened violence 15 to 25-plus years ago and was not able to gain control over his alcohol and substance abuse at those times, and therefore would relapse and pose an unreasonable risk of danger if released. In other words, the decision was based on the immutable factors of appellant's past conduct.

A great deal of evidence presented to the trial court indicated that things had changed for appellant. He was 64 years old, not 50. He suffered from numerous debilitating medical conditions that were growing progressively worse over the years. He had abstained from alcohol for 14 years, he had received consistently positive work

32

evaluations in prison and his only disciplinary records were for such minor infractions as violations of grooming standards and smoking a cigarette.

The record makes clear that appellant's offenses, both in the late 1980's and in 1998, were directly related to his alcohol abuse. Aside from his avoidance of alcohol in prison—which the evidence indicated was readily available—appellant's current medical condition has a clear bearing on his likelihood of relapse. Appellant testified that he had learned he was not able to drink at all without losing control, and that because of his liver condition, drinking would be akin to killing himself. Accordingly, he planned to participate actively in AA and to live with his sister and her husband, who maintained a sober household. There is no suggestion in the record that the medical conditions which gave appellant a life-or-death reason to avoid alcohol existed when he failed to remain sober while on parole two decades ago or when he relapsed around the time of the 1998 offense.

The prosecutor's position at the sentencing hearing was that appellant remained sober in prison only because he was being treated with methadone and an antidepressant, and therefore did not need to resort to prohibited substances. The prosecution presented no evidence to support this view; it simply argued the inference it wished the court to draw. Subia, however, testified that he did not view appellant's prescribed medications as a substitute for alcohol because, unlike the many inmates Subia was aware of who hoarded prescribed medication or used it in addition to alcohol or other controlled substances, appellant followed the directions of his physicians without misusing or abusing his medication. Subia also noted that appellant had taken it upon himself to do AA work despite being unable to directly attend meetings due to his mobility issues. Korpi, who specifically evaluated the issue for the defense, deemed appellant's risk of relapse into alcohol abuse to be "low-moderate." Korpi stated that appellant's "historical risk is so very high that he will always be at some risk to resume drinking, but the clinical markers in this case are exceptionally good, and his risk-management factors and medical needs are, by and large, protective." The factors Korpi identified as underlying his conclusion were that appellant did not "present as angry, bitter and blaming," was

33

cooperative with medical and psychiatric staff, acknowledged that alcohol use was life-threatening for him, had sought out psychological treatment as needed, and had adequate insight into the nature of his alcoholism, a history of being responsive to treatment and intervention, and sound plans for the future.

The trial court's remarks demonstrate its awareness that appellant's past dangerous behavior was connected to alcohol abuse and its assumption that appellant would relapse if released from prison, but do not acknowledge, much less explain, its rejection of the evidence suggesting relapse was not very likely.

The trial court did expressly disagree with Subia's conclusion that appellant would not pose an unreasonable risk of danger if released, noting that it questioned Subia's conclusions "in light of the factors that he didn't know about [appellant] and the fact that they had no effect on his opinions." The trial court did not identify what factors it was referring to. We are aware of three instances where Subia indicated he was not aware of information pertaining to appellant. First, Subia acknowledged that he was not aware that appellant was "reported at one point saying well maybe I was lighting a cigarette, that's how the fire happened, I didn't set a fire with lighter fluid[.]" Subia was asked whether this "minimization" affected his risk assessment but did not in fact answer this question. Second, Subia testified on cross examination that he was not aware that appellant "was there four months after the fire, drunk as a skunk, and went at a police officer with a screwdriver[.]" He was not asked whether this affected his assessment. Third, Subia was asked if appellant had mentioned that after the fire he told his wife, "I will get out of jail some day," the police officer asked if that was a threat and appellant said, "you bet it is." Before Subia answered, the prosecutor continued, "Does that fact change your assessment of risk?" Subia answered in the negative but we have no way of knowing whether he was answering the first question, the second, or both.

The trial court apparently understood Subia as having testified that he had not been aware of these three facts and that they would not have altered his assessment of appellant's dangerousness, although the literal testimony does not fully support this characterization. Regardless, two of the three facts at issue relate solely to appellant's

past conduct. Subia's evaluation of appellant's dangerousness was based on appellant's *post*-offense conduct: his ability to refrain from using drugs and alcohol, the absence of serious or violent offenses in his prison record, his tutoring and helping other inmates, his age and his physical condition. Since Subia was aware of appellant's criminal history, it must be concluded that he considered the indicators of appellant's present functioning more important than his past conduct in assessing current dangerousness. Accordingly, it is not surprising that his view would not be not changed by the additional information about appellant's conduct 15 years before. The trial court simply disagreed about the importance of the past conduct.

As to the remaining point, appellant having stated that he did not set the fire with lighter fluid and might have been lighting a cigarette, perhaps the trial court agreed with the prosecutor's view that appellant was minimizing the events. As we have said, the court did not elaborate what it had in mind in referring to information Subia did not have about appellant. Appellant's testimony was somewhat more equivocal than the prosecutor's question made it sound: He testified that he *believed* he was lighting a cigarette and did not *believe* lighter fluid was involved, but also that "maybe something else happened," he was "pretty messed up" and all he really remembered was sitting on the couch two feet from the door and the fire department coming in.[15] Subia stated that in his interview appellant "was clear in the fact that he was involved in the crime with regard to setting the fire and the reasons behind it."

Subia's conclusion that appellant would not pose an unreasonable risk to public safety if released appears to be consistent with all the assessments of appellant's

_____

[15] Appellant testified, "what I believe happened is I thought that I was lighting a cigarette or something. And I caught the curtains on the door on fire. But maybe I— maybe something else happened. I don't know. I was pretty messed up. [¶] All I know, I was sitting on the—I remember sitting on the couch two feet from the door. And I remember the fire department coming in. That's all I really remember." On cross examination, asked why he needed flammable fluids to light a cigarette, appellant responded, "[t]here was no flammable fluids." When the prosecutor followed with, "so that crime really didn't happen? That was an accident?" appellant stated, "[n]o, it did happen. But I don't believe there were flammable fluids involved."

35

dangerousness. Appellant's score on the California Static Risk Assessment administered by the Department of Corrections and Rehabilitation was 1, meaning "low." Korpi, whose evaluation of appellant the court did not mention, agreed that appellant's "risk to violently act out in the future is low." Like Subia, Korpi focused on indicators of appellant's *current* level of dangerousness, expressly acknowledging that appellant had been "a dangerous man" in his thirties and forties, but noting that the present issue was his dangerousness "now, a quarter of a century since his last conviction for violence." Korpi's conclusion that appellant's risk of violence was low was based on statistical evidence of extremely low rates of violent recidivism for individuals of his age and evidence of appellant's reduced "antisocial impulse" in his prison file—his "better-than-average work reports," his compliance with treatment, the absence of recent rules violations and fact that the most recent one, a decade before, was "exceptionally minor (grooming)," the lack of "ongoing evidence of depression, affective instability, or agitation" and appellant "no longer harbor[ing] the resentments of what it means to be antisocial," not being "prone to blaming" and not feeling himself to be a victim, appellant's insight into his antisocial and drinking behavior, and his acknowledgement of the damage he had done to himself and others and assignment of blame to himself. The trial court did not mention, much less explain, its rejection of Korpi's evaluation and the Department's own risk assessment.

The trial court's emphasis of the comments of the original sentencing court and of this court on appellant's appeal from his three strikes sentence add nothing to its explanation. That appellant, in 1999, had an intractable alcohol problem and was a "classic case" "within the spirit of the three strikes law" in 1999 (according to the sentencing court) and was "extremely dangerous" (according to our prior opinion) does not establish that he remained so in 2013, more than a decade later.

In short, based on the trial court's lengthy explanation of its ruling, it found that appellant would pose an unreasonable risk of danger if released due to his history of substance and alcohol abuse, the seriousness of his offenses and the fact that he relapsed into alcohol abuse while on federal parole, despite undisputed evidence that appellant had

36

not committed a serious or violent felony for over 25 years, had not consumed alcohol for 14 years, suffered from numerous medical conditions that severely impacted his mobility and life expectancy; had no significant disciplinary record in prison, had consistently positive work evaluations, and had been assessed as low-risk for violent re-offense by the Department of Corrections, a former Department official with many years expertise in inmate risk evaluation, and a psychologist retained by the defense to evaluate this question. The court said nothing to explain its rejection of the evidence favorable to appellant.

Appellant's age and physical infirmity alone require more consideration than the trial court appears to have given them. Korpi's report specifically noted that according to Department of Justice statistics, "[a]t age 60 and above, approximately 3% of men violently recidivate (by contrast, 5 years recidivism rates for men in their 30's cluster about 25%.)" This low recidivism rate is consistent with that reported in connection with parole release. We have observed that "due to their age, the recidivism rate of lifers is dramatically lower than that of all other state prisoners, indeed infinitesimal. (Weisberg et al., Stanford Criminal Justice Center, *Life in Limbo: An Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California* (Sept. 2011) 1, 17 (*Stanford Study*).)" (*Stoneroad, supra,* 215 Cal.4th at p. 634.) The *Stanford Study* observed that in one study of 860 murders paroled since 1995, the recidivism rate was less than one percent, as compared to a 48.7 percent rate of recommitment for new crimes for the state's overall inmate population. (*Stoneroad*, at p. 634, fn. 21, citing *Stanford Study* at p. 17.) According to the *Stanford Study,* "other studies 'demonstrate that as a general matter, people age out of crime. For most offenses—and in most societies—crime rates rise in the early teenage years, peak during the mid-to-late teens, and subsequently decline dramatically. Not only are most violent crimes committed by persons under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50.' " (*Stoneroad*, at p. 634, fn. 21, quoting *Stanford Study*, at p. 17, fn. omitted.)

The same point has been made by the three-judge federal court overseeing litigation addressing the serious overcrowding in California's prisons. As we discussed in *Stoneroad,* California is required by federal court order to reduce its prison population in order to remedy systemic violations of the Eighth Amendment, the primary cause of which was found to be the prison's severe overcrowding. (*Brown v. Plata* (2011) 563 U.S. 493.) In 2013, denying a motion to vacate the federal court order, "the three-judge court found, among other things, that the state had failed to take many of the measures identified in the court's prior order and opinion, specifically including the ' "release or diversion of certain [s]ub populations, such as women, the elderly and the sick from prison to community-based facilities.' (*Coleman v. Brown* (2013) 922 F.Supp.2d 1004, 1051.) Citing the *Stanford Study,* the three-judge court lamented the fact that 'despite their low level of recidivism,' very few lifers have been released. (*Coleman v. Brown,* at p. 1051, fn. 47.) As the court pointed out, notwithstanding the fact that 14 percent of California's lifer population, which consists of over 30,000 prisoners, are over 55 years of age, the state has 'taken no meaningful action to release elderly low-risk prisoners in this category.' (*Id.* at p. 1051.)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 634.)

Proper implementation of the Reform Act plays a part in addressing the problem of prison overcrowding.[16] One of the bullet-points highlighted in the argument in favor of

---

[16] Appellant has requested that we take judicial notice of certain materials he views as supporting an inference that "in petitions decided before Proposition 47, judges in San Mateo County applied a standard of 'dangerousness' that was not only much broader than the definition of that standard in new section 1170.18, subdivision (c), but also broader than the standard applied statewide by judges in other counties." He offers four documents:

(1) "Records" of the San Mateo County Superior Court "in 14 cases, showing that 10 petitions for resentencing were granted and 4 (29%) were denied on dangerousness grounds" (exhibit G);

(2) A federal district court "[r]ecord" consisting of the CDCR's March 17, 2014, Status Update for the three-judge panel "showing in ¶ 3, p. 2, that as of that date 'over 1,700 petitions [under § 1170.126] have been reviewed by state courts and only 59 petitions (3.5%) were denied resentencing [on "dangerousness" as opposed to eligibility

Proposition 36 set forth in the Official Voter Information Guide specifically addressed this issue:

"MAKE ROOM IN PRISON FOR DANGEROUS FELONS

"Prop. 36 will help stop clogging overcrowded prisons with non-violent offenders, so we have room to keep violent felons off the streets."

_____

grounds]' (<http://www.cdcr.ca.gov/News/docs/3JP-March 2014/March-2014-Status-Report.pdf>)" (exhibit H);

(3) The October 15, 2014, Status Update "showing in ¶ 3, p. 2, that '[a]s of October 1, 2014, approximately 1901 third-strike inmates have been released' " (exhibit I); and

(4) "Proposition 36 Progress Report (April 2014) by Stanford Law School 'Three Strikes Project,' showing on pp. 1 and 3 that 1613 petitions under section 1170.12 had been granted and 1500 remained pending, on p. 2 that 'To date, 96 percent of petitions filed and adjudicated under Proposition 36 have been granted', and on p 1 that 'The CDCR data shows that the recidivism rate of prisoners released under Proposition 36 is 1.3 percent' (compared to over 30 percent for all other inmates). (https://www.law.stanford.edu/sites/default/files/child-page/595365/doc/slspublic/ThreeStrikesReport.pdf)" (exhibit J).

Appellant urges that exhibits G, H and I are court records that we may judicially notice under Evidence Code section 452, subdivision (d), and exhibit J under Evidence Code section 452, subdivision (h), "facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

For the reasons discussed earlier in this opinion, we reject appellant's contention that the definition dangerousness used in Proposition 47 applies to resentencing under section 1170.126. The suggestion that San Mateo County judges deny a disproportionate number of resentencing petitions, while disturbing if true, is not directly relevant to the present appeal, in which the question remains whether it was an abuse of discretion to deny the petition of this defendant in the individual circumstances of this case. For this reason, we deny the request for judicial notice. (*Mangini v R.J. Reynolds Tobacco Co., supra,* 7 Cal.4th at p. 1063.) Moreover, while exhibits H and I may be court records in that they were filed in federal district court, this does not enable us to take judicial notice of the truth of all matters stated in them. (*Mangini,* at p. 1063.) Exhibit G does not in fact appear to be an official court record: It is merely a typed list of 10 case numbers and names under the heading "Petitions Granted" and four case numbers and names under the heading "Petitions Denied on 'Dangerousness' Grounds." Nothing in this exhibit indicates how it was compiled or whether it is exhaustive.

Clearly, there may be cases in which an elderly and/or infirm inmate would pose an unreasonable risk of danger if released from prison. But the statistical evidence of declining rates of recidivism is dramatic and not to be dismissed without reason. At 65 years of age, appellant is not elderly, but he is well over the age at which recidivism rates have been found to drop significantly—and, if released, he will still have years under federal supervision. Moreover, his physical infirmities are extreme. To be sure, his most recent offense did not require physical strength or mobility. But, as we have said, that offense was committed over 15 years ago. No evidence presented to the trial court suggested appellant was in the same frame of mind as he was at that time or otherwise was likely to commit a similar offense, much less a serious or violent felony such as he had committed some 25 years ago.

To reiterate, "Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*In re Lawrence, supra,* 44 Cal.4th at p. 1219.) "Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*Id.* at p. 1221.)

The record in the present case does contain "affirmative evidence of a change in the prisoner's demeanor and mental state," yet the trial court failed to explain how the immutable facts of appellant's past conduct and threats "realistically constitute . . . reliable or accurate indicator[s]" of his *current* dangerousness. (*In re Lawrence, supra,*

40

44 Cal.4th at p.1219.)  The point is not that the trial court is required to expressly discuss each piece of evidence before it, but that what the trial court said here fails to demonstrate a reasoned analysis articulating "a rational nexus between [appellant's past conduct] and current dangerousness."  (*Id.* at p. 1227; see *In re Young, supra,* 204 Cal.App.4th at p. 305.)  As a result, we cannot find that the court " 'balanced the relevant facts and reached an impartial decision in conformity with the law.' "  (*People v. Zichwic* (2001) 94 Cal.App.4th 944, 961.)  Remand is required for the trial court to reconsider its decision.

## DISPOSITION

The order denying appellant's petition for resentencing is reversed and the matter remanded to the trial court for reconsideration in accordance with the views expressed herein.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.